[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 654 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 655 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 656 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 657 
DECISION AND JUDGMENT ENTRY
Timothy Wingo appeals the termination of his parental rights and the grant of permanent custody of his child to Ross County Children's Services ("RCCS") by the Juvenile Division of the Ross County Court of Common Pleas. He assigns the following errors:
 I. THE TRIAL COURT ERRED IN ORDERING PERMANENT CUSTODY TO CHILDREN'S SERVICES BOARD AS SUCH WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 II. APPELLANT WAS DENIED DUE PROCESS OF LAW AND EQUAL PROTECTION AS GUARANTEED UNDER THE UNITED STATES CONSTITUTION AND THE OHIO CONSTITUTION.
 III. APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT BOTH THE TRIAL LEVEL AND THE PERMANENT CUSTODY PROCEEDINGS.
Finding no merit in any of these assigned errors, we affirm the trial court's judgment.
 I.
Timmy Wingo (D.O.B. 6/5/98) was removed from his mother, Tina Wright's, custody on June 9, 1998 because his half-sister, Brandy (D.O.B. 7/5/95), had already been found a dependent child. Temporary custody was awarded to RCCS and Timmy was placed in the custody of Chris and Dayna Johnson, Ms. Wright's cousin and his wife. After a few weeks, the Johnsons indicated that they were no longer able to care for Timmy and he was placed in foster care. Timmy was later determined to be a dependent child.
In May 1999, the court returned Brandy to Ms. Wright's custody; however, it extended temporary custody of Timmy and RCCS was attempting to reunite him with his mother. This reunification was not accomplished, and in August 1999 the court again removed Brandy from Ms. Wright's custody. In September 1999, RCCS filed a motion for permanent custody of Timmy. The hearing on the motion was originally scheduled in January 2000 but was rescheduled when Mr. Wingo appeared without counsel. The magistrate appointed counsel for Mr. Wingo and the hearing was conducted in April and August 2000. *Page 658 
The magistrate issued her findings and, in November 2000, the court granted RCCS's motion to terminate the parental rights of Mr. Wingo and Ms. Wright and placed Timmy in the permanent custody of RCCS. In December 2000, Mr. Wingo filed a motion for leave to file objections to the magistrate's findings out of rule and objections to the magistrate's findings. The court found good cause to allow the objections to be filed out of rule but overruled them on the merits, approved the magistrate's decision, and affirmed its prior judgment. A timely appeal was filed.
 II.
In his first assignment of error, Mr. Wingo argues that the court's grant of permanent custody of Timmy to RCCS is against the manifest weight of the evidence. We disagree.
A parent's right to raise his or her child is an "essential" and "basic civil right." In re Murray (1990), 52 Ohio St.3d 155, citing Stanley v.Illinois (1972), 405 U.S. 645, 651, 31 L.Ed.2d 551, 92 S.Ct. 1208. Moreover, parents have a "fundamental liberty interest" in the care, custody and management of the child. In re Murray, citing Santosky v.Kramer (1982), 455 U.S. 745, 753, 71 L.Ed.2d 599, 102 S.Ct. 1388. However, the rights and interests of a natural parent are not absolute.
R.C. 2151.413, which permits a public children services agency to file a motion requesting permanent custody of a child, states:
 (A) A public children services agency * * * that * * * is granted temporary custody of a child who is not abandoned or orphaned may file a motion in the court that made the disposition of the child requesting permanent custody of the child.
R.C. 2151.414(B) provides that a court may grant a motion for permanent custody if the court determines, by clear and convincing evidence, that: (1) permanent custody is in the best interest of the child; and (2) the child cannot be placed with either of his parents within a reasonable period of time or the child should not be placed with his parents. The "best interest" determination and the "cannot be placed with either parent" determination focus on the child, not the parent. R.C. 2151.414(C) prohibits the court from considering the effect that the granting of permanent custody to a children services agency would have upon the parents. In In re William S. (1996), 75 Ohio St.3d 95, 97, the Court wrote:
 Initially, we note that in interpreting the statutory provisions pertaining to juvenile court, we must carry out the purposes of the statute as stated in R.C. 2151.01: *Page 659 
 The sections in Chapter 2151. of the Revised Code * * * shall be liberally interpreted and construed so as to effectuate the following purposes:
 (A) To provide for the care, protection, and mental and physical development of children subject to Chapter 2151. of the Revised Code;
(B) * * *
 (C) To achieve the foregoing purposes, whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interests of public safety * * *.
When making the best interest determination, courts must consider all relevant factors. R.C. 2151.414(D) provides that relevant factors include the child's probability of adoption and whether adoptive placement would benefit the child, the child's interaction with family members and others, the child's custodial history, and the child's need for a legally secure permanent placement. When making the determination of whether the child cannot be placed with either of his parents within a reasonable period of time, a court must likewise consider all relevant evidence. If the parents have failed "continuously and repeatedly" to substantially remedy the conditions which led to the temporary custody order, R.C.2151.414(E)(1) requires the court to find that "the child cannot be placed with his parents within a reasonable time." That subsection requires that courts consider the parents' utilization of social and rehabilitative services that were made available to them. If the parents have demonstrated a lack of commitment toward the child, R.C.2151.414(E)(4) also requires that the court find that "the child cannot be placed with his parents within a reasonable time."
In In re Butcher (Apr. 10, 1991), Athens App. No. 1470, unreported, we noted that R.C. 2151.414 does not require that each and every condition listed in subsection (E) exist before the court may terminate parental rights. The trial court may make its decision based solely on the existence of one of the conditions. When R.C. 2151.414(E)(1) forms the basis for the court's finding, the agency must have provided a case plan and time to remedy the situation that led to the removal of the children from the household. However, the other factors listed in R.C. 2151.414(E) do not require application of a case plan nor time to remedy the situation. See In the Matter of Mark H. (Apr. 30, 1999), Lucas App. No. L98-1238, unreported.
When permanent custody is sought by motion, R.C. 2151.419 is also applicable. R.C. 2151.419(A)(1) requires that the court determine whether the children services agency that will be given custody of the child has made reasonable efforts to make it possible for the child to return home safely. The agency has the burden of proving that it made reasonable efforts. However, the child's *Page 660 
safety and health are paramount in determining whether reasonable efforts were made.
In a permanent custody proceeding, trial courts must use the "clear and convincing evidence" standard of proof. See R.C. 2151.414. Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof. In State v.Schiebel (1990), 55 Ohio St.3d 71, 74, the Court wrote that the standard of "clear and convincing evidence" is defined as:
 * * * that measure or degree of proof which is more than a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.'"
An appellate court should not substitute its judgment for that of the trial court when competent and credible evidence going to all the essential elements of the case exists. Id.; In re Kincaid (Oct. 27, 2000), Lawrence App. No. 00CA3, unreported. This standard of review is used by appellate courts in reviewing awards of permanent custody of children to children services agencies. See Jones v. Lucas CountyChildren Services Board (1988), 46 Ohio App.3d 85, 86; In re Lay (1987),43 Ohio App.3d 78, 80; In re Wright (Oct. 4, 1990), Washington App. No. 90CA10, unreported. In Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80, the court reviewed the principle that reviewing courts may not re-weigh the evidence, but must affirm judgments supported by competent, credible evidence:
 The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.
See, also, C.E. Morris Co. v. Foley Construction Co. (1978),54 Ohio St.2d 279, and In re Butcher, supra.
The court found that RCCS made reasonable efforts to prevent Timmy's removal from the home, that Timmy was not abandoned, and that he cannot be placed with either parent within a reasonable period of time. The court further found that Timmy needs a legally secure home and this cannot be accomplished without a grant of permanent custody. Moreover, Timmy is a good candidate for adoption. The court went on to find that Mr. Wingo and Ms. Wright have failed continually and repeatedly to substantially remedy the conditions which required removal. Mr. Wingo and Ms. Wright also demonstrated a lack of commitment *Page 661 
toward Timmy by failing to regularly support, visit, provide an adequate permanent home, and meet Timmy's basic needs. Therefore, the court found that it was in Timmy's best interest to grant permanent custody to RCCS.
As pertains to Mr. Wingo, the court found that he had only one visit with Timmy prior to the filing of the permanent custody motion and had not established a relationship with Timmy. Mr. Wingo did not complete parenting classes and his personal and home life is unstable. He has not displayed an ability to meet Timmy's basic needs or provided any support or maintained his own home.
Todd Helmick, the RCCS caseworker assigned to Timmy's case, testified that in the most recent case plan the concerns he identified were that Timmy's basic needs were not being met, that Ms. Wright and Mr. Wingo needed to learn and demonstrate proper parenting skills, and that Mr. Wingo needed to take a more active role in Timmy's life. He was also concerned that the parents had been involved in illegal activities, utilized drugs and/or alcohol to deal with their problems, and did not exercise visitation. These concerns were similar to those expressed by RCCS throughout the life of the case.
Mr. Helmick testified that Ms. Wright seemed to be working towards reunification with Timmy as of May 1999.[1] She completed parenting classes as required, though she missed several classes. She was visiting with Timmy and had been reunited with Brandy, who was living with her. RCCS was planning on reuniting Ms. Wright and Timmy in June or July 1999. However, shortly after Brandy began residing with her, Ms. Wright began "slipping." Ms. Wright canceled or failed to appear for numerous visits with Timmy and when she did visit with Timmy, she always ended the visits early for various reasons. Ms. Wright stated that she couldn't handle Timmy and that he "got on her nerves." She missed ten out of fifteen visits between June 1, 1999 and September 7, 1999. From September 14, 1999 to December 29, 1999, Ms. Wright attended four visits out of the sixteen that were scheduled. From January 5, 2000 to April 4, 2000, RCCS scheduled fourteen visits and Ms. Wright did not attend any. Mr. Helmick and Carol Wormith, Timmy's foster mother, outlined a series of problems which had occurred during visitations, including Ms. Wright failing to have diapers, transporting Timmy in a vehicle without a car seat, and simply not being home when Timmy was brought to her apartment for visitation. *Page 662 
RCCS also received numerous reports of parties and other activities at Ms. Wright's apartment. Though RCCS obtained housing for Ms. Wright through the Municipal Housing Authority, she was evicted from her apartment in January 2000 because of continuous complaints from neighbors, local police and the Housing Authority security guard. Ms. Wright was also arrested for driving without a license and contributing to the delinquency of a minor. She tested positive for marijuana use in June 1999. Ms. Wright also failed to maintain contact with her caseworker and RCCS was frequently unable to contact her. Mr. Helmick testified that although RCCS provided Ms. Wright with numerous resources and referrals, she continued to stray from her case plan and would "party" instead of providing for and caring for her children.
Jannie Thomas, the protective services supervisor at RCCS, testified that Mr. Wingo was originally in the military and that RCCS attempted to contact him via certified mail. When he returned to Ross County, Mr. Wingo never contacted RCCS. Visits with Timmy were scheduled and Mr. Wingo was advised of the visits but did not attend. Ms. Thomas further testified that RCCS made numerous attempts to maintain contact with Mr. Wingo. Although Mr. Wingo was referred for parenting classes, he never attended them.
Ms. Thomas testified that she had a conversation with Mr. Wingo in August 1999. She instructed Mr. Wingo to contact RCCS, maintain contact, and participate in visitation so he could develop a relationship with Timmy. Mr. Wingo's contact with RCCS between August 1999 and April 2000 was sporadic at best and Ms. Thomas had no personal contact with him during that period.
Mr. Helmick testified that prior to the filing of the motion for permanent custody, Mr. Wingo had only attended one visitation with his son, on December 18, 1998. On that occasion, Mr. Helmick explained the case goals to Mr. Wingo and told Mr. Wingo what he needed to accomplish in order to obtain custody of Timmy, including providing for Timmy's basic needs and taking a positive role as Timmy's father. He also needed to learn and demonstrate proper parenting skills. Mr. Wingo never attended parenting classes. Scheduled visitations continued until March 15, 1999 when the visitations were terminated because Mr. Wingo failed to attend. Mr. Wingo provided excuses such as being sick, forgetting or being in jail or in trouble with the law. Mr. Helmick testified that he saw Mr. Wingo's name in the newspaper several times for being "in trouble with the law" and that he was often unable to contact Mr. Wingo for this reason.
Mr. Helmick testified that Mr. Wingo has never provided for any of Timmy's basic needs such as child support, food, or clothing. Mr. Helmick indicated that he planned to work with Mr. Wingo on his parenting skills when Mr. Wingo visited with Timmy. However, Mr. Wingo failed to return for visits so Mr. Helmick was never able to accomplish this goal. *Page 663 
After the first hearing in April 2000, Mr. Wingo began attending visitation with Timmy. He attended roughly twelve out of fourteen scheduled visits. However, Mr. Helmick stated that he still had concerns regarding visitation because Mr. Wingo was sometimes late. Mr. Helmick also expressed concern that Mr. Wingo had been in a couple of car accidents during that period. On one occasion in July 2000, Mr. Wingo informed Mr. Helmick that he was hospitalized but Mr. Helmick later learned that Mr. Wingo was in jail. Mr. Helmick also noted that Mr. Wingo was cited for drunkenness in May 2000.
In approximately July 2000, Mr. Wingo informed Mr. Helmick that he was working as a subcontractor for Cross Creek Satellite and living with his boss. However, Mr. Wingo was unable to tell Mr. Helmick his boss' name and failed to provide pay stubs or other employment verification when asked to do so. Mr. Wingo later provided Mr. Helmick with his boss' name.
In August 2000, Mr. Helmick conducted a home study of Mr. Wingo's residence. Mr. Wingo was living with his girlfriend, Erin Baldwin, and her children in Oak Hill. The home conditions appeared fine but Mr. Helmick was concerned with the stability of the situation given Mr. Wingo's prior history. Mr. Helmick noted that prior to living with Ms. Baldwin, Mr. Wingo lived in a homeless shelter and had a history of living with various women. Mr. Helmick testified that Mr. Wingo has two other children by two other women and he seems to have a problem with maintaining a stable relationship. Mr. Wingo also told Mr. Helmick that his estranged wife is pregnant.
Ms. Wormith testified that she would be willing to adopt Timmy if permanent custody was awarded to RCCS. She testified that she has bonded with Timmy, that he calls her "mommy," and he is happy in her home. Mrs. Wormith also testified that Timmy plays with Brandy but he considers her only a playmate and has not bonded with her. Betty Blazer, Ms. Wright's aunt who has custody of Brandy, testified that Brandy and Timmy have bonded. Mrs. Blazer also testified that Ms. Wormith and Timmy love one another.
Based on this testimony, we find that the court's award of permanent custody of Timmy to RCCS is not against the manifest weight of the evidence. Competent and credible evidence supports the court's conclusion that permanent custody is in Timmy's best interest and that he cannot be placed with either Ms. Wright or Mr. Wingo within a reasonable period of time or should not be placed with either parent. There is also ample evidence to support the court's finding that neither parent has supported Timmy throughout his lifetime and, despite reasonable efforts on the part of RCCS, neither parent is stable enough to care for Timmy. Mr. Wingo's first assignment of error is overruled.
 III.
In his second assignment of error, Mr. Wingo argues that he was denied due process of law and equal protection as guaranteed by the United States and *Page 664 
Ohio Constitutions. Mr. Wingo maintains that these constitutional guarantees were violated because RCCS never had any intention of considering appellant or his family as possible placements for Timmy. Moreover, he argues that the evidence indicates that RCCS preferred to keep Timmy, who is "light complected" with his white foster family rather than with Mr. Wingo's African-American family. We disagree.
As noted in the first assignment of error, the court properly found that Timmy could not be placed with Mr. Wingo within a reasonable time period. Therefore, we will not reiterate the evidentiary support for this conclusion. The court also found that RCCS looked to other relatives for placement but none was appropriate. There is ample support in the record to refute Mr. Wingo's allegations that RCCS never considered placing Timmy with his family.
Ms. Thomas testified that she conducted a home study of Cheryl Limley Evans, Mr. Wingo's mother, in June 1998 and concluded that Timmy should not be placed there. Specifically, RCCS was aware of a substantiated allegation of physical abuse in 1994 involving Mrs. Evans and Mr. Wingo when he was a juvenile. RCCS was also aware of current problems in the home between Mrs. Evans and her daughter. Additionally, there were allegations, including statements from Mr. Wingo, that Mrs. Evans abused alcohol. Mrs. Evans was arrested around the time of the home study for endangering children, though the charge was eventually dismissed. Further, Mrs. Evans told Mr. Helmick that she had some medical concerns arising out of a car accident.
Mr. Helmick testified that visitations were scheduled between Mrs. Evans and Timmy at the agency between December 18, 1998 and March 15, 1999. Mrs. Evans would frequently fail to appear for visitation. There was also an incident in December 1998 where Mrs. Evans was escorted out of the agency because she became hostile and began using profanity. Mrs. Evans commented that RCCS was racist and that Timmy did not look like he was Mr. Wingo's baby, though paternity had already been established.
Shortly after Timmy's birth, Ms. Thomas also approached Sally Limley, Mr. Wingo's maternal grandmother, regarding placement of Timmy. Mrs. Limley stated that she was unable to take custody because of other family commitments. In the summer of 1999, Mr. Helmick again asked Mrs. Limley if she would be willing to take custody of Timmy but she expressed the same concerns. However, in December 1999, after the permanent custody motion was filed, Mrs. Limley contacted RCCS and indicated that she was willing to take Timmy as she was no longer caring for one of the children she'd previously had in her custody.
Mr. Helmick testified that he attempted to complete a home study for Mrs. Limley but was unsuccessful. Mrs. Limley was unable to provide information regarding her monthly expenses and Mr. Helmick asked her to contact him with the information so *Page 665 
that he could determine the economic feasibility of placement. Mrs. Limley failed to contact Mr. Helmick and he never received the required information. Mr. Helmick was also concerned because he'd obtained a police report regarding a domestic dispute between Mrs. Limley and her husband, though no criminal charges were filed. Additionally, Mr. Helmick was concerned that Mrs. Limley would be unable to provide long-term care for Timmy due to her advanced age and health problems. Mr. Helmick also noted that Mrs. Limley had not seen Timmy since shortly after his birth and Timmy was extremely bonded with his foster mother. He expressed concern over Mrs. Limley's unwillingness to take custody of Timmy until the last minute.
Mrs. Limley testified that RCCS contacted her about taking custody of Timmy shortly after his birth but she declined. After the girl she had custody of was returned to her mother, Mrs. Limley contacted RCCS and told them she would take custody of Timmy. Mrs. Limley denied that there was any domestic violence in her home but admitted that she'd called the police a couple times because her husband became so angry he couldn't breathe.
Mrs. Limley testified that when Mr. Helmick performed the home study he asked her if she'd seen the baby yet. Mrs. Limley replied that she hadn't seen him since shortly after his birth. Mr. Helmick informed her that he was white and blue-eyed. Mrs. Limley stated that Timmy couldn't be white if Mr. Wingo was the father; he was biracial. Mrs. Limley construed this conversation as meaning that Mr. Helmick felt that Timmy should be placed with a white family. Mr. Helmick denied stating that Timmy should be raised in a white home, though he acknowledged stating that Timmy was light complected.
Mrs. Limley admitted that she was unable to provide Mr. Helmick with the requisite financial information when he came to do the home study because her husband pays the bills. Mrs. Limley also testified that her husband would not give out that information and if Mr. Helmick never received the financial information, it was because her husband did not provide it to him.
Clearly, there was competent and credible evidence to support the court's finding that Timmy could not be placed with either of these relatives. RCCS determined that Mrs. Evans' home would not be an appropriate placement and was unable to complete the necessary home study of Mrs. Limley's home because of her or her husband's lack of cooperation. RCCS had reasonable concerns regarding the placement of Timmy with these family members. Further, even crediting Mrs. Limley's testimony regarding her conversation with Mr. Helmick, there is insufficient evidence to support a finding that RCCS refused to place Timmy with any of Mr. Wingo's family members because of race. Rather, it appears that Mr. Helmick was trying to describe Timmy's appearance to a great-grandmother who hadn't seen her great-grandson in over a year. *Page 666 
In sum, the court's finding that Timmy could not be placed with Mr. Wingo, Mrs. Evans, or Mrs. Limley was supported by the evidence. We find no evidence to support Mr. Wingo's allegation that his due process and equal protection rights were trampled. Mr. Wingo's second assignment of error is overruled.
 IV.
In his final assignment of error, Mr. Wingo alleges that he was denied his right to effective assistance of counsel. Again, we disagree.
The right to counsel, guaranteed in these proceedings by R.C. 2151.352
and by Juv.R. 4, includes the right to the effective assistance of counsel. In re Heston (1998), 129 Ohio App.3d 825, 827. "Where the proceeding contemplates the loss of parents' `essential' and `basic' civil rights to raise their children, * * * the test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking to force the permanent, involuntary termination of parental custody." Id. See, also, In re Brodbeck (1994), 97 Ohio App.3d 652, 657;Jones v. Lucas Cty. Children Services Bd. (1988), 46 Ohio App.3d 85, 86.
We apply the test for ineffective assistance of counsel outlined by the Ohio Supreme Court in State v. Ballew (1996), 76 Ohio St.3d 244, 255. The two-part test requires a showing that: (1) counsel's performance was defective; and (2) the deficient performance prejudiced the result. Id. To prevail, Mr. Wingo must show that counsel's representation fell below an objective standard of reasonableness. Id. at 256-257. Mr. Wingo must also prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 257.
Mr. Wingo was represented by two different attorneys below and is represented by a third attorney on appeal. He asserts that both of his two prior attorneys were ineffective at various stages of the proceedings.
First, Mr. Wingo asserts that his attorney was ineffective at a shelter care hearing on July 2, 1998 wherein the state requested that Timmy be placed in foster care because Ms. Wright's relatives were no longer able to care for him. He argues that his attorney erroneously failed to object to hearsay testimony of Ms. Thomas regarding statements made by Mrs. Evans to the on-call social worker and the supervisor.[2] Ms. Thomas testified that Mrs. Evans was upset that she could not have custody of Timmy and that "she was just going to [go] over and just take him." *Page 667 
While this statement is possibly inadmissible hearsay, the court may have allowed this evidence because it was not being offered for the truth of the matter asserted or as an excited utterance. We need not determine the admissibility of this statement, however, because Mr. Wingo has not demonstrated that the outcome of the hearing would have been different but for this evidence. In other words, given the abundance of evidence before the court, this purported ineffectiveness did not prejudice the result. More importantly, however, the court is not bound by the formal rules of evidence in a shelter care hearing. Juv.R. 7(F)(3).
Mr. Wingo also asserts that Ms. Thomas testified at trial to events and statements outside her personal knowledge without objection from his counsel. We agree that some objections likely would have been sustained had an objection been made during Ms. Thomas' testimony; however, much of the information Ms. Thomas testified to was also testified to by Mr. Helmick and Mrs. Wormith, who had first-hand knowledge of the events. Moreover, Mr. Wingo has not referred this Court to specific examples of counsel's failure to object which prejudiced his case.
Mr. Wingo claims that he was denied effective assistance of counsel because his original attorney failed to submit written argument to the court regarding whether Timmy was a dependent child and failed to appear at the hearing extending temporary custody. Mr. Wingo cites In reDonnelly (Mar. 31, 2000), Ashtabula App. No. 98-A-0054, unreported, for the proposition that his constitutional rights were violated by his failure to have representation at the hearing. However, Donnelly involved a parent who was unrepresented at a permanent custody hearing; there is no question that Mr. Wingo was represented at the permanent custody hearing. Further, Mr. Wingo's counsel indicated that Mr. Wingo had not been in contact with him and Mr. Wingo himself was not present at the hearing regarding the change in temporary custody, the dispositional hearing, or the hearing regarding the extension of temporary custody. Even assuming that trial counsel's failure to provide written argument and failure to appear at one hearing fell below an objective standard of reasonableness, appellant has not demonstrated how he was prejudiced. At that juncture of the case, RCCS was attempting to reunify Timmy with Ms. Wright and place him with a relative until this goal could be accomplished. Mr. Wingo had expressed no desire to gain custody of his son and Mr. Wingo's relatives were either not interested in custody of Timmy or considered improper placements by RCCS.
Mr. Wingo also asserts that his counsel was ineffective at the hearing regarding permanent custody in that she failed to make a single objection on his behalf, did not put Mr. Wingo on the stand to testify, failed to file objections to the magistrate's findings, and failed to file an appeal. It is well-settled that debatable trial tactics do not give rise to a claim for ineffective assistance of *Page 668 
counsel. State v. Clayton (1980), 62 Ohio St.2d 45,49. Further, an assertion of a claim must be raised with sufficient clarity to indicate a substantial violation of an essential duty.State v. Nabozny (1978), 54 Ohio St.2d 195. Mr. Wingo has not specifically referred us to testimony in the record which his trial counsel improperly failed to object to nor has he demonstrated that counsel was ineffective in failing to have him testify. We have no basis for concluding that his testimony would have been helpful rather than harmful to his case. Further, even assuming his trial counsel was ineffective for failing to file objections and an appeal, Mr. Wingo cannot demonstrate prejudice by these actions. The trial court allowed Mr. Wingo to file objections to the magistrate's findings outside the rule and considered the objections. Mr. Wingo was likewise not denied an appeal in this case due to his counsel's failure to file the requisite notice.
Lastly, Mr. Wingo argues that his counsel was ineffective in failing to attack the constitutionality of the permanent custody statute on the basis that it completely ignores the presumption that the parents are the best placement for the child. Mr. Wingo has cited no support for this contention and, given the unlikelihood of success of such an argument, we cannot conclude that he was prejudiced by counsel's failure to raise this argument.
In sum, we note that judicial scrutiny of counsel's performance must be highly deferential. Tactical or strategic trial decisions, even if ultimately unsuccessful, do not generally constitute ineffective assistance of counsel. State v. Carter (1995), 72 Ohio St.3d 545, 558. Absent a showing that counsel failed to research the facts or the law, or that counsel was ignorant of a crucial defense when he or she made a tactical choice, a reviewing court will defer to counsel's judgment in the matter. Clayton, supra, at 49. We find no such showing here. Mr. Wingo has not demonstrated that counsel failed to produce evidence that would have resulted in the denial of the state's permanent custody motion or failed to object to evidence that, if it had been excluded, would have changed the outcome of this case. Therefore, Mr. Wingo's third assignment of error is overruled.
Having found no merit in any of Mr. Wingo's assigned errors, we affirm the trial court's judgment.
JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court, Juvenile Division, to carry this judgment into execution.
Any stay previously granted by this Court is hereby terminated as of the date of this entry.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
 ________________________ William H. Harsha, Judge
Abele, P.J. Kline, J.: Concur in Judgment and Opinion.
[1] Tina Wright, Timmy's mother, did not file an appeal. Because R.C.2151.414(B) requires a finding that the child cannot or should not be placed with either parent, we address the evidence and findings of the court regarding Ms. Wright. However, Mr. Wingo does not expressly assert that Timmy should have been placed with Ms. Wright. Therefore, we do not consider whether Mr. Wingo has standing to make such an assertion.
[2] Mr. Wingo's appellate brief refers to page 99 of the transcript. However, the submission of an amended transcript changed the page numbering to page 106. *Page 669