DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment of the Lucas County Court of Common Pleas, Juvenile Division, which granted permanent custody of Andrew B. to the Lucas County Children Services ("LCCS"). For the reasons stated herein, this court affirms the judgment of the trial court.
The following facts are relevant to this appeal. Andrew B. was born on August 13, 1997, to appellant, Christopher M. B. ("the father") and Tonie S. Christopher and Tonie separated shortly after Andrew's birth; Andrew remained with Tonie. After LCCS filed a complaint in dependency and neglect on September 12, 1997, Andrew was adjudicated dependent and neglected. In April 1999, the parties agreed that the father would have custody of Andrew. LCCS had protective supervision. The case was closed on July 16, 1999.
On September 13, 1999, LCCS filed a second complaint in dependency, neglect and abuse as well as a motion for a shelter care hearing. In the complaint, LCCS cited the following about Andrew: his small size for his age; his weight loss; medical concern that he was a failure to thrive infant; his excessive nail biting; his chronic lice; his lack of interaction with other children; and his excessive sleeping. LCCS also noted that the father had lived in three different places in six months. At the conclusion of the shelter care hearing, the magistrate determined that LCCS should provide protective supervision in the father's home. The same individual was appointed as counsel and guardian ad litem ("GAL") for the child. Counsel was appointed for Tonie; the father was represented by counsel.
On November 1, 1999, LCCS filed an amended complaint in dependency, neglect and abuse as well as a motion for a shelter care hearing of the child. The trial court granted the motion for shelter care and awarded temporary custody of Andrew to LCCS. LCCS created a case plan with the goal of evaluating Andrew regarding concerns that his failure to thrive was psychosocial; Andrew was placed in foster care and family visitation with Andrew was limited.
On December 8, 1999, the father, with counsel present, consented to an adjudicatory finding of dependency and Andrew was adjudicated a dependent child. Temporary custody was awarded to LCCS. The trial court denied the objections to the magistrate's decision. Case plan services were established.
On August 23, 2000, LCCS filed a motion for extension of temporary custody for a period of six months. The father opposed this motion and a hearing was held. At the hearing, the father stipulated to the extension of custody and the review hearing was set for February 28, 2001.
On February 1, 2001, LCCS filed a motion for permanent custody. In his report dated February 28, 2001, although noting that there was some risk involved, the GAL recommended that Andrew be integrated into the father's home.[1] Both parents and Andrew's grandfather[2] filed separate motions for Andrew's custody.
On June 6, 7, 8, July 10, 26 and August 20 and 21, 2001, this case proceeded to trial on the motion for permanent custody. On July 26, 2001, Tonie withdrew her motion for custody of Andrew and voluntarily surrendered her parental rights. The trial court questioned Tonie regarding her decision to surrender her parental rights. Tonie stated that she would like Andrew to stay with his foster parents.[3]
The LCCS caseworker responsible for the case in 1998, when legal custody had been given to the father with protective supervision by LCCS, testified that the father had been involved with LCCS because of a prior child he had fathered with another woman; during that case, he attended parenting classes. For this case, the father went through 12 sessions of parenting classes as well as interactive parenting sessions at St. Vincent's. The caseworker testified that there was animosity and conflict between the parents' families and that the parents were sent to counseling together to resolve the conflict. The caseworker testified that she addressed the emotional effect on Andrew of this conflict again and again although Andrew's problems were not being recognized by the father's family. The caseworker testified that the grandfather did not aid in the conflict resolution. She also testified that Andrew was more at ease at Tonie's home. She testified that both families reported that Andrew was shaking or nervous and had odd eating habits.
The caseworker testified that although the case was closed in July 1999, a referral was made in the fall of 1999. Andrew, then just under two years of age, had been taken to an emergency room for an ear infection and the doctor reported that Andrew was grossly under weight, weighing only 19 pounds; showed signs of distress; and his nails were bitten down.
The caseworker also testified that although the father had completed the services required, he would not take responsibility for his actions and the effect of these actions on Andrew. She felt that Andrew's paternal side would not be good custodians for him because they denied visitation to the maternal family; they were inflexible in their attitude toward the maternal family; and they refused to get a second medical opinion about Andrew's nail biting, dark circles under his eyes and lack of weight gain.
The registered nurse who had been responsible for monitoring Andrew's well care and growth and development since 1997 testified. She testified that Andrew's growth between birth and six months was on target but between six months and one year when he should have tripled his birth weight to approximately 19 pounds, he was only 16 pounds. Between 1 and 2, Andrew should have gained 5 to 6 pounds but he only gained 3.4 pounds; this lack of weight gain resulted in Andrew only weighing 20 pounds at age two when he should have weighed 25 pounds. Andrew gained no weight while he was in his father's care during the first three months of his second year; the only growth during his second year occurred in foster care. The nurse attributed Andrew's lack of growth to the stressors in his life as the rises and falls in weight gain all seemed to correlate with family visits. Andrew's largest growth gain, 1.4 pounds in approximately 5 weeks, occurred while he was in custody of LCCS and when there was no family contact.
The nurse also testified that in attempting to find a cause for Andrew's failure to thrive, she wanted Andrew to be examined by Dr. W. David Gemmill; Dr. Gemmill had reviewed Andrew's medical records and expressed concern that Andrew had failure to thrive. Andrew's father who had custody at that time refused. When Andrew was in LCCS custody, a complete medical workup was conducted and organic failure to thrive was ruled out. The diagnosis of non-organic failure to thrive was concluded to be the cause of Andrew's lack of growth.
The nurse testified that she examined Andrew when he was taken into custody in November 1999. She stated that Andrew had lost two ounces in approximately two months and she described him as pale and thin, with poor hygiene and head lice. Andrew had sunken eyes, limited tone in his arms and legs and had difficulty extending and pulling up his arms. He had open, small infected areas along his nails because they had been bitten down to the skin. Andrew had poor interaction with adults with very limited eye contact; he alternated between wanting to be cuddled and held to avoiding any contact. On testing, Andrew had delays on all four areas of a developmental screening tool: personal, social, adaptive and motor.
The nurse testified that although Tonie asked questions about Andrew's care, read material provided to her and did additional research on her own, the father did not. The nurse also testified that the father did not believe Andrew had a problem when Andrew lived with him; that the father just went through the motions regarding the services required of him; and that the father did not feel that Andrew had shown any progress during the time in custody. She testified that her concern with the father has always been that he has not fully understood that Andrew has major issues; that Andrew has been traumatized; and that the father had a role in what happened to Andrew. The nurse testified that her biggest concern with the father is his lack of empathy, that he has never seen that Andrew has problems and issues.
Dr. Gemmill, a board certified pediatrician, former director of the Regional Child Abuse and Neglect Prevention Program at the Medical College of Ohio from 1990 and now the director of the Child Maltreatment Program at Mercy Children's Hospital, Toledo, was qualified as an expert in the area of child abuse. He testified that his initial opinion that Andrew was a failure to thrive child resulted from his review of Andrew's records from the clinic at LCCS and private physicians. Dr. Gemmill testified that from this data the diagnosis of failure to thrive was easy to make; the diagnosis of failure to thrive, psychosocial, resulted from ruling out physical causes. He also testified that Andrew's severe weight loss followed by a loss of length is a classic presentation for caloric deficiency. Dr. Gemmill testified that Andrew has had such a loss over such a period of time that he will never regain his genetic potential. Using exhibits demonstrating Andrew's weight loss and gain, Dr. Gemmill concluded that when Andrew is in the presence of his family he is unable to grow at an appropriate rate. Dr. Gemmill testified that he had concerns about putting Andrew back into his father's environment given Andrew's lack of adequate growth during the time he was with his father.
Dr. Nancy Carroll, a board certified child and adolescent psychiatrist, testified. Dr. Carroll conducted a psychiatric evaluation of Andrew and coordinated his therapy. She identified his psychiatric diagnosis as reactive attachment disorder which is a problem with developing a significant relationship over the duration of the first two years of life. Dr. Carroll testified that something happens with these children that interferes with a normal relationship, i.e. abuse, trauma, multiple changes. Reactive attachment disorder is a life-long problem and these children have a hard time developing a loving, caring relationship with others.
Dr. Carroll had recommended that family visits be curtailed because of Andrew's reaction to the visits, including an increase in his nail biting and appearing anxious and tense. She initially observed that Andrew had social deficiencies, such as inappropriate attention seeking. After being in foster care and a preschool, Andrew's social skills were improving and he was doing better with his peers.
Dr. Carroll testified that she believed the father did not really understand Andrew's problems. She was concerned about Andrew being with the father's new baby; she did not believe that someone could attend to Andrew's needs and care for a new baby. She testified that children with attachment disorder do better when they are the only child. She testified that she believed it was in Andrew's best interest to stay with the foster parents.
Dr. Kathleen Baird, a psychologist who evaluated the father, testified that she administered the Minnesota Multiphasic Personality Inventory ("MMPI"), an objective measure of personality characteristics and behaviors to the father and he was defensive and was less willing to be open and honest in responding to questions. Furthermore, she testified that the L scale, the lie scale, was significantly elevated. Such a result indicated that the father was deliberately not being honest and not admitting to faults and weaknesses that he believed he has. The pattern of his scores on the MMPI also indicated that he lacks insight; another significant score was that of over-controlled hostility.
Dr. Baird also administered the hand test which is a projective measure used to look at a person's behavioral repertoire. The father's test suggested a likelihood for aggressive behaviors consistent with the MMPI results and a rather restricted range of interpersonal responses.
Dr. Baird concluded that one of the most detrimental aspects of the father's ability to parent was his lack of stability. She also expressed concern about his lack of insight and stated that it would be more difficult for the father than for most parents to acknowledge Andrew's special needs of failure to thrive and reactive attachment disorder.
An early intervention specialist who worked with Andrew from January 2000 testified that Andrew was identified as having an expressive language delay, a delay in fine motor skills and a delay in social and emotional skills. She worked with the foster mother on a monthly basis until Andrew was three years old and started in a special needs preschool. During the time she worked with Andrew, she saw an increase in his expressive language and an improvement in fine motor skills and behaviors.
A mental health therapist who worked with Andrew in play therapy testified that she began working with Andrew in November 2000 and saw him weekly with his foster mother. The therapist testified that the foster mother followed through with suggestions given to her and was very receptive to suggestions for providing for Andrew. The therapist testified that Andrew appears to have a strong bond with his foster mother.
This therapist also met with the father and Tonie, once individually and twice together, to provide parenting education. Based upon these sessions with the father, she had significant doubts as to the father's ability to provide the type of intensive care emotionally, developmentally and socially that Andrew requires. She described the father as having a blunted affect on every occasion that she saw him; this blunted affect might limit his ability to mirror Andrew's emotional state, an important developmental opportunity Andrew did not get earlier in his life. She also described the father as having limited eye contact; she testified that eye contact is very important in a child's development because without adequate eye contact, a child does not develop a sense of self.
This therapist testified that the father would require significant amounts of mental health therapy to address his own childhood issues; his instability in significant romantic relationships; and the causes of his blunted affect. She had concerns about the father's ability to be empathetic. She testified that Andrew requires a parent who is empathetic and emotionally self-aware so that the parent can respond to Andrew.
She described the foster mother as very insightful into Andrew's behaviors; very in tune with Andrew; and very aware of his needs on a daily basis. This therapist recommended that Andrew remain in the custody of his foster parents for now and the foreseeable future. She testified that to remove Andrew again would be detrimental because he had formed a successful attachment to the foster parents.
The foster mother, a registered nurse, testified that Andrew has been fostered in her home this time for over one and one-half years. Andrew was also placed with this foster family when he was removed from Tonie's custody at one month of age and stayed until he was eight months old.
The foster mother testified that Andrew has made great improvement in the developmental delays he exhibited when he first came into her care. He had been very fearful when he came to them the second time; he would turn his head to avoid eye contact and act afraid during diaper changing. Andrew initially would leave food in his mouth, sometimes for hours; he also would not eat at times. He also would sneak food and, if seen, would drop the food and bow his head and cover his eyes as if he was ashamed. Andrew also inappropriately sought affection from strangers. Andrew has improved his vocabulary as well as his interaction with his peers.
The foster mother described her efforts to communicate with the father and the father's interaction and communication with Andrew. She stated that the father did not have any eye contact with her; that he would hold Andrew away from his body; and that she never saw the father show any excitement in seeing Andrew. The foster mother testified that her concern about the father regaining custody was that the father is either unable or unwilling to recognize that Andrew has problems. She testified that she did not think it was in Andrew's best interests to be returned to his father. The foster mother testified that she was intimidated by Andrew's grandfather and he was very unfriendly; she also felt animosity from the father's family. The foster mother also testified that Andrew's grandfather appeared to be very angry.
The foster mother stated that she and her husband initially were not interested in adopting Andrew because they were afraid of his reactive attachment disorder and his behaviors. However, they have educated themselves and have learned how to deal with Andrew. She stated that they know Andrew has a bond with them and that it would be very detrimental for him if it was broken.
The LCCS caseworker responsible for the case since November 1999, testified that Andrew was removed from his father's custody because of his failure to thrive, his excessive nail biting, developmental delays and inappropriate bonding. The caseworker described Andrew as very frail and fragile, looking ill and very neglected when he was removed from his father's custody. Andrew now has the appearance of a well-cared for child whose needs are first and foremost; Andrew is now sociable.
The caseworker outlined the services offered to Andrew and the parents. The father was sent to parenting classes; education was provided about reactive attachment disorder; psychological testing was conducted; and counseling services were provided to address his own mental health issues. Meetings were facilitated with Andrew's medical providers to provide education about his conditions. The caseworker met with the father at least one time per month.
The caseworker testified that one of his concerns was that both parents focused more on what their rights were and not what was in Andrew's best interests. He testified that the parents have very limited to no insight in regard to Andrew's needs. The caseworker also testified that even though the father has attended services, he has never taken responsibility for his part in Andrew's problems. The caseworker testified that at a diagnostic assessment in January 2000, Andrew's grandfather stated that there was nothing wrong with Andrew and that he did not need any services. The caseworker testified that there is a bond between Andrew and his foster family; Andrew trusts the foster parents. The caseworker recommended that LCCS be awarded permanent custody of Andrew.
An early intervention specialist who worked with the father, his wife and their son Jordan was subpoenaed by the GAL. This specialist testified that she saw them because Jordan reached developmental milestones behind the time they were typically expected. She could not remember whether they were self-referred or if a pediatrician referred them. This specialist testified that the father interacted well with Jordan during her visits; she stated that during the nine months she had worked with the family on an every other week basis, she saw the father approximately five time. She also testified that because she did not know Andrew, she could not make any judgment on whether or not the father and his wife were capable of handling Andrew.
The supervisor of the LCCS parenting class program testified. She had supervised the caseworker working with the father during a prior LCCS case in which the father was involved because of a child he had fathered with another woman. During this case, she observed the father with Andrew and determined that the father needed to acquire basic parenting skills. During an observation period, she noticed that the father was not engaged with Andrew and was simply there. Although the father attended all the parenting classes and, thus, completed the program, she noted that in both the pre-and post-tests, his results were invalid in that he was "faking good" and attempted to present himself in a false light. His "lie scale" was even higher on the post-test than on the pre-test.
The deposition of one of a group of four pediatricians who cared for Andrew prior to Andrew being removed from the father's custody was read into the record. This pediatrician first saw Andrew when he was nine months old, shortly after the father had obtained custody. She described Andrew as small but in good health. He was seen at one year of age and his weight, height and head circumference were between the fifth and tenth percentile; she was not alarmed by his measurements at this visit. None of the pediatricians in her group ever documented any concerns about Andrew's weight, height or head circumference. She felt that Andrew's weight, height and head circumference charts were within the range of what she would expect given his medical history and the size of his parents. On cross-examination, the pediatrician admitted that nail biting indicates that a child is anxious and testified that she would expect Andrew to either bite his nails or suck his thumb because of the family stress. In regard to the growth charts, she testified that one cannot look at the growth charts without looking at the child and knowing what was going on with the child.
Tonie was called as a witness by the father after she had voluntarily surrendered her parental rights. Tonie testified that although the father had completed the parenting classes, he did not attend all the classes and she did not believe he learned parenting skills and had not gained any extra knowledge by going to the classes. Tonie admitted that she had expressed concerns to the caseworker and the parenting instructor about Andrew being returned to the father. Tonie testified that during the time Andrew was in his father's custody, the paternal grandfather and great-grandparents were primarily watching Andrew.
Heather, the father's wife, testified that she and the father were married on May 15, 2001. She also testified that she and the father have lived together since their son Jordan was born on April 16, 2000. Heather testified that she has seen a change in the father since the parenting classes in that he thinks differently and he knows how to cope better with his stress. She testified that she is a stay-at-home mom and would care for Andrew if the father was awarded custody. On cross-examination, she testified that she never saw Andrew store food in his mouth and that Andrew did not act nervous or anxious; she did not see any delays except that Andrew could only say a few words and she stated that she did not know if that was normal. In regard when information the father obtained articles on reactive attachment disorder and failure to thrive from a computer search, Heather admitted that the former had a date and time of June 27, 2001 at 5:30 p.m., and the latter had a date and time of July 25, 2001 at 4:41 p.m., the evening before the hearing at which she testified.
Andrew's paternal great-grandparents who participated in caring for him when he was in his father's custody testified. These great-grandparents testified that Andrew was a happy child; that they did not see anything wrong with him; and that there was no reason why the father should not have custody of Andrew. The paternal great-grandmother testified that she never noticed any developmental delays in Andrew.
Andrew's paternal grandfather who participated in caring for him when he was in his father's custody and who also sought custody testified. The grandfather testified that the father loved and cared for Andrew and spent time playing and interacting with Andrew. The grandfather testified thatthe father was capable of caring for a special needs child and that the grandfather was willing to participate and do everything necessary to make sure Andrew is healthy. The grandfather also testified that he knew of no reason why Andrew should not be returned to the father and that if the father was not acceptable, that Andrew should be returned to the grandfather. On cross-examination, the grandfather denied that the father was referred to substance abuse treatment by LCCS in a prior case and denied that the father had a substance abuse problem. However, the grandfather did admit that the father went to AA. The grandfather also testified that he was not concerned that Andrew had any developmental delays because Andrew was speaking and could "say a lot of words."
Andrew's father testified that he is not a very emotional person; that he has done everything LCCS requested him to do except obtain a GED; that he is willing to go to whatever classes he is requested to go to; that he is capable of handling Andrew; and that he and his father together or separately can handle Andrew. The father testified that he believes Andrew and he are bonded. The father presented a videotape made of a visit he had with Andrew in December 2000 to show the bonding between him and his family and Andrew.
The father admitted that he has a record for drug abuse involving marijuana in 1997 but that he has been "clean" since then. On cross-examination, the father admitted that he did not notice that Andrew had developmental delays before he was removed from the father's custody. The father admitted that he did not contact the professionals who conducted evaluations of or treated Andrew. The father testified that although he noticed Andrew biting his nails, he did not bring it to the doctor's attention because it was not as severe as it was made out to be.
The state presented three witnesses in rebuttal. The foster mother testified that the foster family recently went on a 14 day vacation during which time Andrew stayed with a babysitter. This babysitter is one with whom he has stayed three days per week for the almost two years while the foster mother worked. She testified that she prepared Andrew for this separation by having Andrew select pictures of him with the foster family which she placed into a photograph album. During the vacation, she called Andrew every other day. When the family returned, Andrew had dark circles under his eyes, his fingernails were all bitten very, very short and he had lost one pound from his last weight. Andrew was also very clingy and very possessive for several days after being reunited with the foster family. Andrew looked much healthier after about a week with his foster family.
A registered nurse who worked in the LCCS medical clinic testified that on July 17, 2001, before his foster family's vacation, Andrew weighed 26 pounds; on August 2, 2001, after his foster family's 14 day vacation, Andrew weighed 25 pounds. On the day she testified, August 21, 2001, Andrew had regained the weight he had lost during his foster family's vacation and weighed 27 pounds and 3 ounces.
The maternal great-grandmother testified that she supervised the visits between Tonie and Andrew in her home while Andrew was in the father's custody. The maternal great-grandmother testified that initially Andrew came to the visitations clean but in the summer of 1999, the father would bring Andrew dirty and with soiled diapers. Andrew's clothing would have to be washed because his clothing smelled of cigarette smoke; she testified that the father smoked. She testified that although Tonie smoked, Tonie was not allowed to smoke in the maternal great-grandmother's home. In addition to the lack of cleanliness, she also began to notice that Andrew was losing weight; that Andrew could cling to whomever was carrying him and cry on the return to the father; that Andrew had flea bites; that Andrew had head lice; that Andrew's eating habits changed and he began to hold food in his mouth; that Andrew began to sleep more; that Andrew had black circles under his eyes; and that Andrew would bite his nails to the degree that they would bleed and become infected.
Andrew's paternal grandfather testified on surrebuttal and disagreed with the maternal great-grandmother's testimony. The paternal grandfather testified that he only saw Andrew bite his nails one time and that was after a visit. The paternal grandfather denied ever seeing head lice on Andrew; denied ever seeing Andrew hold food in his mouth; denied that Andrew wanted to sleep more than his normal nap times.
The GAL recommended that permanent custody to LCCS be denied and that Andrew be reunified with the father. Upon questioning by the attorney for LCCS regarding his lack of visits to the foster family within the six months before the trial, the GAL testified that he did not feel it was necessary to observe Andrew with his foster family. The GAL testified that he had observed Andrew during the visits with his biological parents.
On August 27, 2001, in an oral decision following the trial, the trial court granted permanent custody of Andrew to LCCS and denied the motions filed by the father and the grandfather. On October 2, 2001, the trial court entered its judgment entry. The trial court found by clear and convincing evidence, pursuant to R.C. 2151.414(B)(1), that it was in Andrew's best interest to grant permanent custody to LCCS; the trial court also found that, pursuant to R.C. 2151.414(D), that it was in Andrew's best interest to grant permanent custody to LCCS. The trial court found that, pursuant to R.C. 2151.414(B)(1)(d), Andrew had been in the temporary custody of LCCS for 12 or more months of a consecutive 22 month period. The trial court also found that, pursuant to R.C.2151.414(E)(1) and (4), that Andrew could not be placed with either parent within a reasonable period of time. Appellants filed a timely notice of appeal. In this appeal, appellants set forth the following two assignments of error:
 "I. The trial court erred in Granting Lucas County Children Services Board permanent custody of the minor child, Andrew B., because Lucas County Children Services failed to prove by clear and convincing evidence the criteria to commit a child to the permanent custody of a public children services agency.
 "II. The trial court erred in permitting the natural mother to present a defense to the motion for permanent custody and then permitting the natural mother to voluntarily terminate her parental rights and withdraw her motion for custody on the last day of the dispositional hearing."
In their first assignment of error, appellants argue that the trial court's findings that permanent custody was appropriate and the LCCS made reasonable efforts to prevent permanent removal are not supported by clear and convincing evidence. This court finds no merit in this assignment of error.
On appeal from an order terminating parental rights, an appellate court will not reverse the trial court's judgment if, upon a review of the record, it determines that the trial court had sufficient evidence to satisfy the clear and convincing standard. In re Wise (1994),96 Ohio App.3d 619, 626. The "clear and convincing evidence" standard is a higher degree of proof than the "preponderance of the evidence" standard generally utilized in civil cases but is less stringent than the "beyond a reasonable doubt" standard used in criminal cases. State v.Schiebel (1990), 55 Ohio St.3d 71, 74. An appellate court will not substitute its own judgment for that of a trial court applying a "clear and convincing evidence" standard where some competent and credible evidence supports the trial court's factual findings. Id.; C.E. MorrisCo. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, syllabus. The Ohio Supreme Court has explicitly stated that direct evidence and circumstantial evidence have the same probative value. State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph one of the syllabus. The factfinder is free to believe some, all, or none of the testimony of any witnesses.Domigan v. Gillette (1984), 17 Ohio App.3d 228, 229.
R.C. 2151.414(B)(1) provides that a court may grant permanent custody of a child to a public services agency if the court determines, by clear and convincing evidence offered at the custody hearing, that it is in the best interest of the child and that any one of the conditions apply.[4]
When relying on R.C. 2151.414 as the basis for its grant of a motion for permanent custody, a court needs to find the existence of only one of the conditions listed in R.C. 2151.414(E). In re Wingo (2001),143 Ohio App.3d 652, 659. If R.C. 2151.414(E)(1) is the basis for the court's finding, the agency must have provided a case plan and time to remedy the condition that led to the removal of the child from the household. The other factors listed in R.C. 2151.414(E) require neither the formulation of a case plan nor the time to remedy the condition. Id.
The trial court found that clear and convincing evidence established that R.C. 2151.414(B)(1)(d) was satisfied. The evidence showed that Andrew was in the temporary custody of LCCS from November 1, 1999 through February 1, 2001, when the motion for permanent custody was filed, a period of 17 months after the initial complaint had been filed and 15 months after Andrew had been placed in foster care. At the time the hearing on this matter started, Andrew had resided with his foster family for 19 months.
The trial court also determined that R.C. 2151.414(E)(1)[5] and (4)[6] applied. Clear and convincing evidence was offered to demonstrate that despite the services he was offered and completed, the father lacked insight into and understanding of Andrew's condition. Additionally, there was clear and convincing evidence that the father would be unable to provide the emotional care Andrew required and that the father would not accept responsibility for Andrew's condition.
In regard to a child's best interest, the juvenile court is required to consider all relevant factors, including, but not limited to the following as set forth in R.C. 2151.414(B):
 "(1) The interaction and inter-relationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
The trial court found that Andrew's best interests would be served by an award of permanent custody to LCCS. These findings are consistent with the evidence. The play therapist who worked with Andrew testified that the foster mother was able to meet Andrew's special needs and responded appropriately to him. Other testimony established that Andrew had gained weight while with the foster family and had bonded with his foster family. The foster mother testified that Andrew was improving in the areas where he had had developmental delays and expressed her interest in adopting him. She and her husband could therefore supply a legally secure permanent placement for Andrew. On the other hand, the evidence established that the father had not completed high school, had a special needs child with his wife and was not viewed by any of the medical experts as having the skills necessary for Andrew's special needs.
In regard to appellants' argument that the GAL recommended that the father be granted custody, the trial court is not bound by the recommendation of a GAL. As the court stated in In re Height (1976),47 Ohio App.2d 203, 206:
"The function of a guardian ad litem or for a representative for the child is to secure for such child a proper defense or an adequate protection of its rights. The ultimate decision in any proceeding is for the judge and not for the representative of the parties and the trial court did not, for that reason, err in making an order contrary to the recommendation of the child's representative * * *." In accord, In re:Ericka B. (Aug. 3, 2000), Allen App. No. 76493; In the matter of: AnthonyH. (May 9, 2000), Cuyahoga App. Nos. 1-99-93, 1-99-94 and 1-99-95.
Therefore, this court concludes that clear and convincing evidence was offered on the best interest factors relevant to the juvenile court's determination that permanent custody of Andrew should be awarded to LCCS.
Accordingly, the first assignment of error is found not well taken.
In the second assignment of error, appellants contend that the trial court erred in permitting Tonie to present a defense to the motion for permanent custody and then permitting her to voluntarily terminate her parental rights and withdraw her motion for custody. This court finds no merit in this assignment of error.
In regard to this assignment of error, appellants cite no authority for their contentions. Additionally, although appellants contend that Tonie withdrew her motion for custody and surrendered her parental rights on the last day of the disposition hearing, that was not the case. Tonie withdrew her motion for custody and surrendered her parental rights on July 26, 2001; the disposition hearing continued and additional testimony was given on August 20 and 21, 2001. Appellants were also able to examine Tonie.
R.C. 5103.15 provides that a parent may agree to surrender permanent custody of a child with the approval of the juvenile court; the juvenile court may approve the permanent surrender if it determines it is in the child's best interest. Id. Juv.R. 38(B) contains similar provisions concerning the voluntary surrender of permanent custody of a child to a public children services agency. The trial court in the instant case carefully questioned Tonie to be certain that her decision to surrender was a voluntary act and that she understood that the full legal import was to forever relinquish her parental rights to Andrew. Furthermore, when accepting Tonie's surrender of her parental rights, the trial court stated that although Tonie had indicated that she recommended that Andrew stay with his foster parents, the trial court stated that Tonie's preference would have no bearing on his decision. Tonie was within her rights in opposing the motion for permanent custody filed by LCCS and filing her own motion for custody and then withdrawing the motion. This court finds that the trial court did not err in permitting Tonie to present a defense to the motion for permanent custody and then permitting her to voluntarily terminate her parental rights and withdraw her motion for custody.
Accordingly, appellants' second assignment of error is found not well taken.
On consideration whereof, the court finds that substantial justice has been done the parties complaining, and the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellants are ordered to pay the court costs of this appeal.
JUDGMENT AFFIRMED.
Peter M. Handwork, J., Richard W. Knepper, J., and Mark L.Pietrykowski, P.J., CONCUR.
[1] The father was living with his girlfriend whom he planned to marry and their ten month old boy.
[2] In February 2000, Andrew's grandfather filed a motion to intervene. The motion to intervene was granted on June 6, 2001.
[3] Testimony concerning Tonie will be omitted from this opinion except as it directly relates to appellants.
[4] R.C. 2151.414(B)(1) provides:
 "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and that the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
"(b) The child is abandoned.
 "(c) The child is orphaned and there are no relatives of the child who are able to take permanent custody.
 "(d) The child has been in the temporary custody of one or more public services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999."
[5] R.C. 2151.414(E)(1) provides:
 "Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."
[6] R.C. 2151.414(E)(4) provides:
 "The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child."