DECISION AND JOURNAL ENTRY.
{¶ 1} Appellant Juanita Allen has appealed from a decision of the Summit County Court of Common Pleas, Juvenile Division that granted permanent custody of Appellant's minor children to the Summit County Children Services Board. This Court affirms.
 I {¶ 2} On May 22, 2000, Summit County Children Services Board ("CSB") filed two complaints against Appellant alleging that Appellant's minor children, L.A. and T.A., were dependent pursuant to R.C. 2151.04. CSB requested protective supervision and emergency temporary custody of both children. Attached to each complaint was the following statement:
"1. The condition and circumstances of [L.A.], age 6, and [T.A.], age 4, is such to warrant the State [in] assuming guardianship. The mother, Juanita Allen, who is deaf, has had difficulty in providing these children with a safe, stable home environment. Facing eviction sometime in December [or] January, the mother left her home with the children. The mother and children lived with the mother's sister in Section 8 housing on a temporary waiver from on or around April 10, 2000, through April 18, 2000 when she moved to a [friend's] house with the children. [L.A.] was not in school from December 1999 to April 12th, 2000 due to the lack of residence.
"2. Mother moved from her [friend's] residence to a motel with the children on Sunday, May 21, 2000. Due to [an] argument with her friend.
"3. Currently, the mother and the children are homeless, as they are temporarily housed at Courtesy Inn on Market Street.
"4. Mother is seeking housing but does not have any arrangement made at this time.
"5. Mother has suffered health problems, including seizures which may interfere in her ability to parent the children.
"6. Father of [L.A.] and alleged father of [T.A.], [P.S.] pays child support for [L.A.] but is not able to care for the children via custody or placement."
 {¶ 3} On May 22, 2000, the magistrate issued an order, whereby he found that continued residence of the children in Appellant's care would be contrary to the best interest of the children. The magistrate further found that "[t]he best interest and welfare of the child(ren) require the issuance of an emergency order of custody immediately."
 {¶ 4} After the magistrate granted CSB emergency temporary custody of Appellant's minor children, a review hearing was held on May 25, 2000, and June 29, 2000. As a result of those hearings, a guardian ad litem was appointed to represent the interests of the children; P.S. was established as the biological father of L.A., but was excluded as the biological father of T.A.; further genetic testing was ordered to determine whether P.S. was indeed the father of T.A.; Appellant was ordered to undergo a clinical assessment from Portage Path Behavioral Health; and emergency temporary custody was continued to CSB.
 {¶ 5} On August 10, 2000, Appellant filed a motion to dismiss, whereby she requested the trial court to dismiss the complaint and return the children to her care pursuant to R.C. 2151.28(A)(2). Appellant contended that the complaint should be dismissed because the adjudicatory hearing was scheduled to occur more than sixty days from the date the complaint was filed, in contravention of R.C. 2151.28(A)(2). The motion was overruled. The matter proceeded to final adjudication and disposition on August 29, 2000.[1] The children were adjudicated dependent and the magistrate granted temporary custody to CSB. The magistrate found that "[t]he basis for the finding of dependency is [Appellant's] lack of safe and stable housing. [Appellant] is currently unable to gain assistance from Akron Metropolitan Housing Authority due to the fact that a prior bill to Akron Metropolitan Housing Authority remains unpaid. Budgeting appears to be a major difficulty in this matter." The magistrate further found that "[d]espite reasonable efforts on the part of [CSB], it is impossible at this time to return these children to the mother as the mother lacks safe and stable housing." The magistrate further ordered: (1) Appellant to submit random urine samples for drug screening when requested by CSB; (2) Appellant to undergo a clinical assessment from Portage Path Behavioral Health; (3) CSB to assist Appellant in negotiating housing with Akron Metropolitan Housing Authority ("AMHA") and to investigate resources available in the community that could help L.A. and T.A. learn to communicate with Appellant through sign language. The trial court adopted the magistrate's decision and adjudicated T.A. and L.A. as dependent and awarded temporary custody to CSB.
 {¶ 6} Approximately sixty days after the children were adjudicated dependent, the magistrate held a hearing to review Appellant's status on November 30, 2000. The magistrate found that Appellant 1) obtained appropriate housing through AMHA; (2) failed to submit urine samples as ordered by the trial court; (3) had ongoing budgeting issues that should be addressed further before the children were returned; and (4) required additional counseling. The magistrate ordered that CSB retain temporary custody of Appellant's minor children.
 {¶ 7} On February 2, 2001, after another hearing was held, the magistrate found that Appellant had retained safe and stable housing through AMHA; the children continued to visit Appellant and learn sign language; Appellant missed two appointments with a financial advisor; and Appellant submitted five urine samples and each sample tested negative for the presence of drugs. The magistrate ordered continued temporary custody to CSB.
 {¶ 8} On March 14, 2001, Appellant filed a motion for custody or, in the alternative, a motion for protective supervision. Appellant requested the trial court to terminate CSB's temporary custody and grant her legal custody. Appellant also requested, in the alternative of terminating CSB's temporary custody, that the children be returned under protective supervision. Before the trial court could rule on Appellant's motion, on March 23, 2001, CSB filed a motion to modify temporary custody to protective supervision, whereby it requested the trial court to modify its order of disposition from temporary custody of Appellant's minor children to protective supervision pursuant to R.C. 2151.353(A)(1). CSB acknowledged that Appellant "has made significant progress on her case plan. [Appellant] has maintained appropriate housing. [Appellant] obtained a substance abuse assessment and has left clean urine screens as recommended. [Appellant] obtained an evaluation at Portage Path and no further recommendations were made." On April 2, 2001, the magistrate issued an order which returned T.A. and L.A. to Appellant's legal custody, but under the protective supervision of CSB.
 {¶ 9} On April 23, 2001, CSB filed a motion for a six-month extension of protective supervision, contending that it was in the best interest of the children that a six-month extension of protective supervision be granted. On a review of Appellant's status and hearing on CSB's motion[2], the magistrate found that:
"Due to some ongoing health problems, [Appellant] has not been able to complete all of the case plan objectives. In particular, [CSB] wants to hold off on terminating its involvement until [Appellant] has had an opportunity to receive training in budgeting. Finances have long been a concern in this case and [Appellant's] budgeting problems created the initial involvement of this Court in that [Appellant] and children became homeless. * * * It is therefore important that [Appellant] receive training in budgeting so that she can accept responsibility for her own financial situation."
 {¶ 10} The magistrate also found that Appellant was suffering from seizures and was unable to live on her own until she had completed thirty days without any seizures. Based on his findings, the magistrate granted CSB's motion and ordered a six-month extension of protective supervision to L.A. and T.A.
 {¶ 11} On August 22, 2001, CSB filed a motion for change of disposition, whereby it requested the trial court to grant emergency temporary custody of Appellant's minor children to CSB and to modify the current protective supervision order to an order of temporary custody of T.A. and L.A. CSB maintained that after the children were returned to Appellant in April 2001, Appellant repeatedly tested positive for cocaine, and "CSB attempted to work with [Appellant] regarding her evaluation of her substance abuse problem. [Appellant] denied cocaine use but again tested positive." The trial court granted emergency temporary custody of Appellant's children to CSB; it did not rule on CSB's motion regarding the modification of the current protective supervision order to permanent custody of L.A. and T.A.
 {¶ 12} Another hearing was held before the magistrate on August 28, 2001. The trial court found that according to Mrs. Jacqueline Abrams-Rodkey, a protective caseworker with CSB, Appellant submitted four consecutive urine samples and each sample tested positive for cocaine. The magistrate also found that since being placed with Appellant, the children had not been registered to enter Akron Public Schools. The trial court continued CSB's temporary emergency custody of Appellant's minor children.
 {¶ 13} On September 20, 2001, Appellant and CSB filed separate motions. Appellant filed a motion for a six-month extension, whereby it requested the trial court extend CSB's custody for another six months. Appellant contended that "[a]n additional six months will allow [Appellant] to drop negative screens, and follow through with any recommendations with the Community Health Center." CSB filed an amended motion for change of disposition to include the dispositional option of legal custody to a relative, whereby CSB amended its August 22, 2001, motion to include the alternative permanent disposition of legal custody to the children's maternal grandmother, Georgia Allen.
 {¶ 14} A hearing was held on October 1, 2001. At the hearing, Appellant, CSB, and P.S. (L.A.'s biological father) offered joint motions to continue the matter. The magistrate found that the motion to continue was offered to: (1) allow the guardian ad litem a chance to visit with the children while residing with their maternal grandmother; (2) allow the guardian ad litem to prepare and file a written report for review; and (3) to allow the maternal grandmother to submit urine samples for substance abuse analysis. The magistrate ordered that CSB's emergency temporary custody of Appellant's children continue. The magistrate further ordered the maternal grandmother submit urine samples for substance abuse analysis to the Community Health Center.
 {¶ 15} On November 2, 2001, CSB filed a motion to withdraw its prior motion, which requested legal custody of Appellant's children be given to Appellant's mother, on the ground that Appellant's mother also tested positive for cocaine. CSB also requested a second six-month extension of temporary custody. On November 14, 2001, the magistrate granted CSB's motion to withdraw the prior motion for legal custody to a relative and the second six-month extension. The magistrate further found that it was in the best interest of the children that they not be returned to Appellant.
 {¶ 16} On February 27, 2002, after a hearing[3], the magistrate found that Appellant submitted seven positive test screens for cocaine and was seen by Family Services one time. While at Family Services, she completed an assessment and it was determined that Appellant exhibited signs of multiple mental health issues, including serious depression. Family Services referred Appellant to Portage Path Behavioral Health for a psychiatric assessment. Appellant failed to return for a follow-up assessment. The magistrate found that it would be in the best interest of the children if they were not returned to Appellant's care. The magistrate also continued CSB's temporary custody of Appellant's minor children.
 {¶ 17} On March 25, 2002, CSB filed two motions: 1) a motion for change of disposition, whereby it requested the trial court to change CSB's temporary custody of L.A. to legal custody to L.A.'s maternal aunt, Candice Allen; and 2) a motion for permanent custody, whereby it requested that the trial court modify its disposition from temporary custody of T.A. to permanent custody.
 {¶ 18} After a pretrial conference, on April 24, 2002, the trial court found that Appellant wanted a guardian ad litem appointed to her; Appellant recently threatened suicide and was psychiatrically hospitalized for one week; Appellant's attorney stated that he was experiencing difficulties communicating with Appellant; and that Appellant failed to make any progress on her case plan. As a result of his findings, the magistrate held that it was not in the best interest for the children to be returned to Appellant's custody.
 {¶ 19} CSB filed another motion on July 1, 2002, whereby CSB withdrew its motion for legal custody of L.A. to a relative and requested that the trial court modify its order of disposition from temporary custody of L.A. to permanent custody of L.A.
 {¶ 20} On November 4, 2002, Appellant filed a motion entitled "Mother's Supplemental Motion For Custody," whereby she requested that the trial court terminate CSB's temporary custody and grant her legal custody of both L.A. and T.A. or, in the alternative, grant Appellant's sister, Candice Allen, legal custody.
 {¶ 21} On November 22, 2002, the magistrate issued an order which granted CSB's motions for permanent custody. In the order, the magistrate noted that due to time constraints the permanent custody evidentiary hearing was divided into two parts.[4] The first phase of the evidentiary hearing occurred on October 7, 2002. Testifying at the hearing was: Shannon Englehardt, the case manager for Family Services; Candice Allen, Appellant's sister; Jacqueline Abrams-Rodkey, a licensed social worker with Children Services Protective Division; and Tony Contessa, a medical technologist at the Community Health Center. The second phase of the evidentiary hearing occurred on November 19, 2002. Testifying on that day was: Cathleen C. Rooks, a licensed social worker with the Community Health Center; Attorney Todd Kotler, guardian ad litem for the children; and Jacqueline Abrams-Rodkey.
 {¶ 22} After hearing all of the evidence, the magistrate found by clear and convincing evidence that permanent custody of L.A and T.A. should be granted to CSB, thus terminating the parental rights of Appellant, P.S., and "John Doe." Appellant timely filed objections to the magistrate's decision. The trial court overruled Appellant's objections, holding that the evidence clearly and convincingly established that granting CSB permanent custody was in the best interest of the children.
 {¶ 23} Appellant has timely appealed, asserting four assignments of error.
 II Assignment of Error Number One
"The decision of the court to grant permanent custody of the children to [CSB] was not in the children's best interests and [appellant] had substantially addressed the cause of removal."
 {¶ 24} In Appellant's first assignment of error, she has argued that the trial court erred when it granted permanent custody of T.A. and L.A. to CSB. Appellant has maintained that the decision to grant permanent custody of Appellant's minor children to CSB was not in the children's best interest. We disagree.
 {¶ 25} "A parent's right to raise his or her child is an `essential' and `basic civil right.'" In re Wingo (2001),143 Ohio App.3d 652, 650, citing In re Murray (1990), 52 Ohio St.3d 155,157. Moreover, "it has been deemed `cardinal' that the custody, care and nurture of the child reside, first, in the parents." Murray,52 Ohio St.3d at 157, citing H.L. v. Matheson (1981), 450 U.S. 398, 410,101 S.Ct. 1164, 67 L.Ed.2d 388. A parent's rights, however, are not absolute. In re Awkal (1994), 95 Ohio App.3d 309, 315. A parent's rights may be irrevocably terminated when it is necessary for the welfare of the child.
 {¶ 26} A trial court can, after conducting a hearing pursuant to R.C. 2151.414, grant permanent custody of a parent's minor children to a public children services agency. An appellate court will not overturn a permanent custody order unless the trial court has abused its discretion.In re Awkal, Ohio App.3d at 316. An abuse of discretion connotes more than a mere error in judgment; it signifies an attitude on part of the trial court that is unreasonable, arbitrary, or unconscionable. Blakemorev. Blakemore (1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Berk v. Matthews (1990), 53 Ohio St.3d 161,169.
 {¶ 27} In determining whether a parent's parental rights should be terminated and permanent custody awarded to the moving agency, R.C.2151.414(B) provides that a court may grant a motion for permanent custody if the court determines by clear and convincing evidence that 1) permanent custody is in the best interest of the child pursuant to the factors set forth in R.C. 2151.414(D) and 2) whether one of the factors in R.C. 2151.414(B)(1)(a) through (d) applies pursuant to R.C.2151.414(B)(1). "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established."State v. Eppinger (2000), 91 Ohio St.3d 158, 164, citing Cross v.Ledford (1954), 161 Ohio St. 469, 477. Further, "[i]t is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." Eppinger, 91 Ohio St.3d at 164.
 {¶ 28} As Appellant has only challenged the trial court's finding that permanent custody of the children with CSB was in the best interest of the child, we need only review the trial court's findings under R.C.2151.414(D). When making the "best interest" determination by clear and convincing evidence, the trial court must consider all relevant factors, including, but not limited, to the following:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
"(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D).
 {¶ 29} Here, the trial court properly considered the appropriate factors as listed in R.C. 2151.414(D) when it concluded that it was in the best interest of the children to grant CSB permanent custody. The trial court specifically found that: "[T]he granting of permanent custody of [L.A.] and [T.A.] to CSB is appropriate based upon the analysis required by [R.C. 2151.414(B)(1)], specifically that the granting of permanent custody of [L.A.] and [T.A.] to CSB is in the best interest of the children[.]" The trial court further stated that "the determination that the granting of permanent custody of [L.A.] and [T.A.] to CSB is in the best interest of the children is based upon consideration of all relevant factors, including those contained in [R.C. 2151.414(D)(1) through (5)]."
 {¶ 30} Moreover, the witnesses testifying at the permanent custody hearing presented evidence to support the trial court's determination that it was in the best interest of the children for CSB to have permanent custody. At the hearing, Jacqueline Abrams-Rodkey discussed the custodial history of Appellant's minor children. See R.C. 2151.414(D)(3). Mrs. Rodkey testified that in May 2000, Appellant "had lost her housing and had lived with a relative, then with Candice Allen for about a week and then with another friend, and finally was picked up on the streets by the police. [Appellant and her two children] were homeless and taken to the Salvation Army, and at that time [CSB] took custody, [emergency temporary custody], of the children. That's May 22, 2000."
 {¶ 31} After CSB assumed emergency temporary custody of the children in May 2000, they remained in CSB's care for approximately a year. Mrs. Rodkey explained that after Appellant showed that she could consistently maintain a place to live, the children were returned to her custody, under protective supervision, in April 2001. However, due to Appellant's seizures, which required some hospitalization, the children had to stay with their maternal grandmother, Georgia Allen, until July 20, 2001. The children were removed from their grandmother's home when it was discovered that their grandmother was also a cocaine user. The children were later placed in the home of their maternal aunt, Candice Allen. The children remained in the aunt's care until September 2002; they were removed from the aunt's care after the aunt notified CSB that she could no longer afford to take care of Appellant's children. After the children were removed from the maternal aunt's home, they were finally placed in foster care and were living there during the permanent custody hearing in October and November 2002.
 {¶ 32} Mrs. Rodkey also testified that the children required a consistent and permanent placement, which provided the trial court with sufficient evidence to consider the children's need for a legally secure permanent placement. See R.C. 2151.414(D)(4). The following discussion took place between Mrs. Rodkey and the prosecution:
"[Prosecution:] What are your main concerns regarding [Appellant] and her ability to care for these children?
"[Mrs. Rodkey:] I guess my main concern is, A, we are where we were two years ago. The kids have been in custody for a long time now and the children need permanency. They need a permanent plan that they can count on, know where they're going to live, know where they're going to go to school and have all their physical and emotional needs met on a consistent basis.
"[Prosecution:] And do you feel that [Appellant] can provide those things for these children at this point in time?
"[Mrs. Rodkey:] No, she cannot."
 {¶ 33} Mrs. Rodkey, Candice Allen, and the children's guardian ad litem Todd Kotler provided testimony regarding the relationships the children maintained with Appellant, Candice Allen, and their current foster parents. See R.C. 2151.414(D)(1). Mrs. Rodkey testified that during Appellant's visits with the children while in foster care, she observed "that there is love, there is hugging."
 {¶ 34} Candice Allen explained that Appellant cared for her children and that a "strong bond" existed between them. She further stated that "I can say when [the children] see [Appellant], they be happy to see her." Despite the love that the children's maternal aunt believed existed between Appellant and her children, Candice Allen testified that when the children were living with Appellant they were not properly clothed or fed and missed school on a regular basis. Candice Allen explained that:
"One year [L.A.] missed a year, a whole year or a half a year or somewhere around there, of school, and they were — behavior was just, I don't know, just basically, I would say out of control. They were basically used to doing what they wanted to do far as running in and out, just going into the refrigerator, eating whatever they wanted to eat. They would — there was no order in their life, basically, I guess I would say."
 {¶ 35} Candice further testified that the children's behavior improved while they were staying with her. She stated that the children "were doing much better since I had them, a lot of progress. They were in school all year long. Spiritually, they were in church, they were involved in praise dance and they were in the choir. They were being kids, basically. They got to do kids' things."
 {¶ 36} Mr. Kotler also testified that he believed that Appellant loved her children. During the hearing he stated:
"I will state that [Appellant] anytime that I have seen her with the children has always been very affectionate towards the kids and they have shown affection and love for [Appellant] that they are certainly very, very bonded, and that is an observation that has been mostly shared throughout the family, whether it's been my interviews with the grandmother, whether it's been interviews with the aunts."
 {¶ 37} In spite of the bond the children appeared to maintain with Appellant, Mr. Kotler stated that "the children almost regard [Appellant] as like a — something between a mom and a big sister. [Appellant] represents fun time to the kids. [Appellant] represents, in my observations, a almost departure from the typical rules and regulations that their foster mothers and their aunt had placed on them."
 {¶ 38} Mr. Kotler's testimony also provided the trial court with sufficient evidence to consider the wishes of the children. See R.C.2151.414(B)(3). Mr. Kotler informed the court that the children wished to be with their mother, stating: "[The children] miss their mom, and insofar as the judgment that a six — and an eight-year-old can make, yeah, they want their mom to be around." Yet despite the children's wishes, Mr. Kotler, acting for the benefit of the children, explained:
"I believe that [Appellant] is attached to the children and I believe that there are some attachment (inaudible) between the children and [Appellant]. All of that notwithstanding, it is this guardian's opinion that [Appellant] has a chronic problem with substance abuse and she is not able to shake it, not for any period of time that she's going to need to sustain in order to care for these children and see them through adulthood, and on that basis, I would ask that the state's motion be granted with respect to [L.A.] and [T.A.]"
 {¶ 39} Based upon the testimony adduced at the permanent custody hearing, we cannot say that the trial court abused its discretion when it found by clear and convincing evidence that it was in the children's best interest to grant CSB's motion for permanent custody. Consequently, Appellant's assignment of error lacks merit.
 Assignment of Error Number Two
"The trial court erred by denying [appellant's] motion to continue on November 19, 2002."
 {¶ 40} In Appellant's second assignment of error, she has argued that trial court erred when it denied her motion for a continuance. We disagree.
 {¶ 41} This Court recognizes that the permanent termination of parental rights has been described as "the family law equivalent of the death penalty in a criminal case.' * * * Therefore, parents `must be afforded every procedural and substantive protection the law allows.'" (Alteration sic.) In re Hoffman, 97 Ohio St.3d 92, 2002-Ohio-5368, ¶ 14, quoting In re Smith (1991), 77 Ohio App.3d 1, 16. However, the decision whether to grant or deny a continuance is within the sound discretion of the trial court and should not be reversed on appeal absent an abuse of that discretion. State v. Unger (1981), 67 Ohio St.2d 65,67. As previously stated, an abuse of discretion connotes more than a mere error in judgment; it signifies an attitude on part of the trial court that is unreasonable, arbitrary, or unconscionable. Blakemore,5 Ohio St.3d at 219.
 {¶ 42} This court has recognized that "[t]here are no mechanical tests for deciding if a denial of a continuance violates due process, but the circumstances present in each case should be considered." In reEarly (Aug. 26, 1998), 9th Dist. No. 18957, at 3, citing Ungar v.Sarafite (1964), 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921, 931. However, in reviewing whether the trial court abused its discretion in denying a motion for continuance, this Court must:
"[A]pply a balancing test, weighing the trial court's interest in controlling its own docket, including facilitating the efficient dispensation of justice, versus the potential prejudice to the moving party. There are objective factors that a court must consider in determining whether to grant a continuance. These factors include the length of the delay requested; whether previous continuances have been granted; the inconvenience to the parties, witnesses, attorneys and the court; whether the request is reasonable or purposeful and contrived to merely delay the proceedings; and whether the movant contributed to the circumstances giving rise to the request." Burton v. Burton (1999),132 Ohio App.3d 473, 476, citing Unger, 67 Ohio St.2d at 67-68.
 {¶ 43} In the case sub judice, Appellant failed to appear at the second phase of the permanent custody hearing. Appellant's attorney, who was in attendance, provided the trial court with a brief explanation as to why his client failed to appear. He explained:
"My client is not here today, Your Honor. Apparently she went to the City emergency, the Akron City Hospital emergency department. I spoke with a Lynn McNara, M-c-n-a-r-a, who is a social worker for Akron City. She did confirm that [Appellant] was in the [emergency room], they would be treating her for symptoms of a headache and watery eyes; however, she will not be admitted to the hospital."
 {¶ 44} Appellant's trial counsel then moved for a continuance. The prosecution, the attorney for L.A.'s biological father, and the children's guardian ad litem opposed the motion; the children's guardian ad litem also requested that the trial court sanction Appellant for failing to attend the hearing. The parties requested that the trial court deny Appellant's motion on the ground that Appellant had an opportunity to be made aware of the hearing and a continuance was previously granted due to Appellant's more severe health problems, i.e., seizures. The trial court denied the motion, stating: "Whether [Appellant] chooses to — I'm going to overrule the motion for a continuance. There's no sanction. If she chooses not to appear, that's her business."
 {¶ 45} After reviewing the record, it is evident that the trial court had sufficient grounds for denying the motion for continuance. Prior to the second phase of the evidentiary hearing, Appellant twice moved to continue the permanent custody hearing. The first request for a continuance occurred on April 24, 2002. Appellant requested that a guardian ad litem be appointed to Appellant; all parties agreed to the continuance and the motion was granted. The second request occurred on July 11, 2002. Appellant's counsel informed the trial court that Appellant suffered a seizure while on the bus and that she continued to feel ill as a result of the seizure; the motion was granted.
 {¶ 46} Upon Appellant's third motion for a continuance, it appears that the trial court, along with the prosecution, L.A.'s father's counsel, and the children's guardian ad litem, believed that Appellant was not actually sick and that she was simply stalling for time. Although Appellant had previously suffered from serious health problems, the trial court found that Appellant's symptoms, i.e., a headache and watery eyes, was insufficient to grant a continuance. Furthermore, the record indicates that more than two years had expired since CSB had filed the initial complaints for temporary custody of the children.
 {¶ 47} As there was evidence to support the trial court's decision to deny the motion for a continuance, we cannot find that the trial court abused its discretion. Consequently, Appellant's second assignment of error is not well taken.
 Assignment of Error Number Three
"CSB did not make reasonable efforts to reunify the family by failing to provide a sign language interpreter during contacts with the case worker and CSB failed to ascertain her cognitive abilities in order to meaningfully effect reunification."
 {¶ 48} In Appellant's third assignment of error, she has argued that CSB failed to make reasonable and diligent efforts to reunite Appellant with her children. Specifically, Appellant has maintained that CSB failed to: 1) provide a sign language interpreter so that Appellant could effectively communicate with her social worker; and 2) assess Appellant's cognitive abilities.
 {¶ 49} As previously discussed in Appellant's first assignment of error, in order for the juvenile court to grant a motion for permanent custody, it must determine by clear and convincing evidence that granting the motion is in the best interest of the child and, in this particular case, that the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.[5] See R.C. 2151.414(B)(1). When making the latter determination, the court shall consider all relevant evidence. R.C.2151.414(E). Further, when making a finding that the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents, the trial court must find that one or more of the sixteen factors listed in R.C. 2151.414(E)(1) through (16) exist. R.C. 2151.414(E).
 {¶ 50} Citing to R.C. 2151.414(E)(1), Appellant has contended that "CSB ha[d] a duty to use reasonable and diligent efforts to assist the parents to remedy the problems that initially caused the child to be placed outside the home." R.C. 2151.414(E) provides, in pertinent part:
"In determining at a hearing held pursuant to [R.C. 2151.414(A)] or for the purposes of [R.C. 2151.353(A)(4)] whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to [R.C. 2151.414(A)] or for the purposes of [R.C.2151.353(A)(4)] that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
"(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."
 {¶ 51} It appears that Appellant has relied on a portion of R.C.2151.414(E)(1) which states "notwithstanding reasonable case planning anddiligent efforts by the agency to assist the parents to remedy theproblems that initially caused the child to be placed outside the home." Based on this language, Appellant has characterized R.C. 2151.414(E)(1) as a "requirement." That is, Appellant has contended that pursuant to R.C. 2151.414(E)(1) CSB was required to use reasonable and diligent efforts to assist her in correcting the problems that caused her to have her children initially removed from her home. Appellant misunderstands the purpose of R.C. 2151.414(E)(1) through (16). R.C. 2151.414(E)(1) is not a "requirement." Rather, R.C. 2151.414(E)(1) is a "factor" that, if found to exist, requires the trial court to make a finding that a child cannot be placed with either parent within a reasonable time or should not be placed with either parent. See In re Porter, 9th Dist. Nos. 21080 and 21089, 2002-Ohio-4860, ¶ 47.
 {¶ 52} This Court further construes Appellant's argument as an overall challenge to the trial court's finding that Appellant's children could not be placed with either parent within a reasonable time or should not be placed with either parent. It appears that Appellant is attempting to argue that there was insufficient evidence for the trial court to make a finding that R.C. 2151.414(E)(1) existed. The trial court specifically found that:
"[T]he children, [L.A.] and [T.A.], cannot be placed with either parent within a reasonable time in accordance with [R.C. 2151.414(E)(1)] based upon the mother's continuous and repeated failure to substantially remedy the conditions that caused the children to initially be placed outside the home, specifically, lack of adequate housing for the children despite reasonable case planning and diligent efforts by the agency to assist mother in remedying this problem."
 {¶ 53} Even if this Court assumes, for the sake of argument, that there was insufficient evidence to show that R.C. 2151.414(E)(1) existed, we conclude that the trial court's finding that the children could not be placed with either parent within a reasonable time or should not be placed with either parent was also based on R.C. 2151.414(E)(2) and (4). The trial court found that:
"[T]he children, [L.A.] and [T.A.], cannot be placed with either parent within a reasonable time in accordance with [R.C. 2151.414(E)(2)] based upon the mother's chronic chemical dependency that is so severe that it makes the mother unable to provide an adequate permanent home for the children at the present time and, as anticipated, within one year after the court holds the permanent custody hearing.
"The Court further finds that the children, [L.A.] and [T.A.], cannot be placed with either parent within a reasonable time in accordance with [R.C. 2151.414(E)(4) based upon the father's demonstrated lack of commitment toward the children as evidenced by his actions showing an unwillingness to provide an adequate permanent home for the children, specifically his acknowledgement that he is unable to care for his child, [L.A.], at this time."
 {¶ 54} The trial court was only required to find that one of the sixteen factors listed in R.C. 2151.414(E)(1) through (16) existed before it could make a finding that the children could not be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(E); see Porter, 2002-Ohio-4860, ¶ 47. Here, the trial court relied on three of the sixteen factors in reaching its decision. Because the trial court relied on other factors besides R.C.2151.414(E)(1) in holding that the children could not be placed with either parent within a reasonable time or should not be placed with either parent, we need not determine whether there was sufficient evidence to find that R.C. 2151.414(E)(1) existed. See Porter, 2002-Ohio-4860, ¶ 45. Consequently, Appellant's assignment of error is without merit.
 Assignment of Error Number Four
"Father, `John Doe' was not properly served with notice of the October 7, 2002 and November 19, 2002 trial date, therefore, the judgment of the trial court is void."
 {¶ 55} In Appellant's fourth assignment of error, she has argued that "John Doe," who is the unknown father of T.A., was not properly served with notice of the October 7, 2002, and November 19, 2002, hearings, and that therefore the judgment of the trial court is void. We disagree.
 {¶ 56} This Court has previously held, and Appellant apparently concedes, that an appellant may not challenge an alleged error committed against a non-appealing party absent a showing that the appellant herself has been prejudiced by the alleged error. See In re Rackley (Apr. 8, 1998), 9th Dist. No. 18614, at 6. Here, Appellant has failed to demonstrate that she was prejudiced by the failure of service on John Doe. She has simply stated that "her rights with regards to the child T.A. were prejudiced by improper service upon John Doe[.]" Without something more than Appellant's self-serving statement that she suffered actual prejudice, this Court must conclude that Appellant lacks standing to raise this issue on appeal. See In re Williams (Jan. 30, 2002), 9th Dist. Nos. 20773 and 20786, at 19. Accordingly, Appellant's fourth assignment of error must fail.
 III {¶ 57} Appellant's assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the, County of, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
BAIRD, P.J. and BATCHELDER, J. concur.
[1] The adjudicatory hearing was initially scheduled for August 9, 2000, but was continued because an interpreter for the deaf was unavailable.
[2] The hearing on CSB's motion was originally scheduled to take place on May 21, 2001, but was continued due to the unavailability of a deaf interpreter.
[3] The hearing was initially scheduled for February 11, 2002, but due to the unavailability of an interpreter for the deaf the hearing was rescheduled.
[4] The magistrate found that "John Doe," the unknown father of T.A., was served with notice of the permanent custody hearing via publication on June 5, 2002. The record does not contain a copy of the publication. However, the instructions to the clerk state that the permanent custody trial was scheduled for July 10, 2002, at 1:30 p.m.
[5] The trial court specifically found that R.C. 2151.414(B)(1)(a) applied. R.C. 2151.414(B)(1)(a) provides: "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either ofthe child's parents within a reasonable time or should not be placed withthe child's parents." (Emphasis added.)