IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 23, 2005 Session

## IN RE: M. H.

### Appeal from the Juvenile Court for Williamson County
### No. 21608    Al Nations, Judge

### No. M2005-00117-COA-R3-PT - Filed December 2, 2005

The trial court terminated the parental rights of the incarcerated father of a seven year old boy.  The father argues on appeal that he was deprived of due process because he was not notified of an earlier dependency and neglect proceeding and because he did not receive effective assistance of counsel during the termination proceeding.  He also claims that the petitioners failed to prove by clear and convincing evidence that it was in his son's best interest that his parental rights be terminated.  We affirm the trial court.

### Tenn. R. App. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and WILLIAM B. CAIN, J., joined.

Jocelyn D. Mims, Franklin, Tennessee, for the appellant, R.A.

C. Diane Crosier, Franklin, Tennessee, for the appellees, L.B. and K.B.

### OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

        This case involves one of three siblings who have already been before this court as the result of multiple petitions to terminate the parental rights of their mother and their respective fathers.  A detailed account of the prior proceedings can be found at *In Re W.B. IV,* No. M2004-00999-COA-R3-JV, 2005 WL 1021618(Tenn. Ct. App., April 29, 2005) (No Tenn. R. App. P. 11 application filed).[1]  The present case was tried in the same court and before the same judge as was the earlier case.  It is not necessary for us to repeat that entire family history in this opinion, for the petition before us involves the rights of the father of only one of the children.

---

[1]That case was consolidated with *In Re: D.D., M.H., W.B. IV,* No. M2004-01572-COA-R3-PT.

M.H., the child who is at the center of the current proceedings, was born on October 24, 1997, to V.H., an unmarried woman. V.H. notified R.A. of the birth of the child and told him that he was the father. R.A. was in jail at the time, having been arrested for drug trafficking on April 29, 1997. During a later argument over the telephone, V.H. told R.A. that he was not the father.

R.A. was ultimately convicted in the U.S. District Court of Middle Tennessee of conspiracy to distribute cocaine, crack cocaine, and dilaudid, and possession with intent to distribute crack. On January 12, 2000, he was sentenced to 180 months in jail. The court recommended that he be incarcerated in a California federal prison and that he participate in a substance abuse program.

The mother, V.H., was addicted to drugs, and she neglected M.H. and her other children. Diann Mustin, a member of an organization called Kadesh Barnea Ministries, Inc., became involved with V.H. The ministry's purpose was to help troubled young mothers care for their children without involving government. After many efforts to help V.H. and her children, when V.H. abandoned her three children in a motel room, Ms. Mustin filed a dependency and neglect petition in the Juvenile Court of Williamson County.

The petition was filed on May 1, 2003, and a hearing was held that day, with the mother appearing. After the hearing, the court found there was probable cause to believe the children were dependent and neglected due to the mother's severe drug abuse problem, her current incarceration, and her abandonment of the children. Ms. Mustin was granted temporary physical and legal custody of the children. The court appointed a guardian ad litem for the children and set an adjudicatory hearing for July 28, 2003, in order to give the mother time to complete a substance abuse program.[2] R.A. was not served with notice of the filing of the petition.

The Mustins knew K.B. and L.B., the petitioners in the present case. The Bs started visiting the Mustins and spending time with V.H.'s children in the Summer of 2003. They visited several times a week, and then had the children visit them in their own home. The Bs already had three children of their own.

With the agreement of the Mustins, the Bs filed a Petition to obtain custody of the three children of V.H. Among other things, the Petition stated that they "wish to adopt the minor children and plan to proceed with legal proceedings necessary to accomplish this adoption." The court ordered a home study of the Bs' home by the Court Appointed Special Advocate ("CASA"), and directed that the findings be reported to the court for the hearing scheduled for July 28, 2003. At the scheduled dependency and neglect adjudicatory hearing, the court found that the Bs' petition should be dismissed "in lieu of granting the original Petition for Dependency and Neglect."

---

[2]The mother waived the statutory requirement that the adjudicatory hearing take place within thirty days so she could participate in the drug rehabilitation program. The court's order further stated, "That the court recommends that V.H. successfully complete a long term inpatient substance abuse program as a prerequisite for the return of the children to her custody, which V.H. agreed to do."

Ms. Mustin, Mr. and Mrs. B, the Court Appointed Special Advocate, and the children's guardian ad litem all appeared. The court found the children to be dependent and neglected due to abandonment by their mother and the mother's failure to comply with the previous order of the court. The court placed the children in the legal and physical custody of the Bs. On October 24, 2003, the Bs filed three petitions for termination of the parental rights of V.H. and of the three fathers of the children in their custody.

When the petition for termination regarding M.H. was served on R.A., he wrote to the Juvenile Court and asked for paternity testing to determine whether he was the biological father of M.H., since "it has not been proven that M.H. is my child." The test was duly ordered and resulted in a finding of a 99.8686% probability that R.A. was the father of M.H. After he received the report, R.A. decided to resist the termination of his parental rights.

The initial hearing on the Bs' petitions for termination was conducted on March 3, 2004. An appointed attorney represented the mother. Other appointed attorneys represented R.A. and W.B.III, the father of one of V.H.'s other children. The Guardian ad Litem represented the interests of the children.[3]

R.A. was not present because he was still incarcerated in California. R.A.'s attorney stated that she had not had the opportunity to communicate with her client. The court noted that the results of the DNA paternity test which R.A. had requested had not yet been reported to the court, and declared that in light of the uncertainties surrounding his situation it would not be able to go forward with the petition to terminate his parental rights, which was accordingly continued until another day.[4]

## II. THE TERMINATION HEARING AND DECISION

After the court was notified of the results of the paternity testing, new counsel was appointed for the father, and the court scheduled a hearing to consider the termination of his parental rights. By that time, R.A. had been transferred from the California prison to a federal prison in Mississippi. The hearing was conducted on October 9, 2004. R.A. participated by telephone conference and was represented in the courtroom by his new counsel.

The Bs' attorney submitted a certified copy of the judgment against R.A., which recited his 180 month sentence. The trial court found that the sentence satisfied the ground for termination of

---

[3]The father of a third child was present without representation. He waived his right to an attorney and declared that he was willing to let his parental rights be terminated because he thought that would be the best thing for the child.

[4]At the conclusion of the lengthy hearing, the trial court terminated the parental rights of V.H. and W.B.III on multiple grounds. They both appealed. This court ultimately reversed the terminations because we found that the Bs had not proven the statutory grounds for termination as to those parents by clear and convincing evidence. At the time of the proceedings at issue in the present case, however, this court had not yet reached a decision in the appeal of the earlier case.

3

parental rights set out at Tenn. Code Ann. § 36-1-113(g)(6): imposition on the parent of a sentence of ten or more years while the child is under eight years of age. The grounds having been established, the court then took testimony as to the best interest of M.H.

K.B. and L.B. testified that they had been married since 1996, that they lived in a three-bedroom house in Thompson Station, with a bonus room that they had converted into an additional bedroom, and that their household included their two biological children, one adopted child, and M.H. and his two half-siblings. The children, five boys and one girl, were all doing well in school, enjoyed playing sports, and got along well with one another. The Bs were able to provide for the needs of all the children without assistance and wished to adopt M.H. and the others. K.B. testified that M.H. calls him Dad, and that the child never mentions any other family members or mentions a father other than himself.

L.B. observed that the three children of V.H. were tightly bonded to one another and that nine-year old D.D., the oldest of M.H.'s siblings and the only girl, had always taken on the motherly role of protecting her brothers. Ms. B. testified that it would be devastating to D.D. if the children were ever separated.

R.A., the biological father, testified that he had seen M.H. once or twice, while he was still in the county jail and the child was between a year and a year-and-a-half old. He stated that he sent pictures of himself to M.H., talked to him on the phone as often as he could, and that M.H. called him Daddy. He had also contacted prison ministries and asked them to send birthday presents and Christmas presents to the child. R.A. had never seen any of those presents and did not remember what they were. As he said, "I gave the people the address of the kids and they sent toys to them."

R.A. testified that all contact with M.H. ceased after V.H. abandoned the children, because he did not know where M.H. was and the Bs did not contact him. He did, however, testify that he called the "Ministry House" several times, but never got any information.[5] He was asked whether he believed that he had really established a bond with M.H. He said that he did, but that he had probably lost that bond. Under further questioning as to R.A.'s main concern about M.H., he stated, "I want to be in his life. Okay, even though I am here, I want to maintain contact with him, . . . I want my family involved in his life."

R.A. stated that he had a twin brother and "I wanted to see if my brother could take care of him and adopt also." He also mentioned a niece and other family members that were possibly interested in the child. His only explanation as to why he did not ask those family members for assistance when he lost contact with M.H. was his doubts about paternity.

---

[5]The children stayed at a house owned by the Ministry before the dependency and neglect proceeding and with Ms. Mustin after that proceeding until the Bs obtained custody. We presume this is the house R.A. was referring to.

During closing arguments, R.A.'s attorney argued that his client did everything he could in light of the constraints on his freedom of action to maintain a relationship with his child, even after V.H. planted a seed of doubt in his mind as to whether he actually was the father.

The argument of the Bs' attorney focused on the factors set out by the legislature in Tenn. Code Ann. § 36-1-113(i) for the courts to consider in determining the best interest of the child and their applicability to the facts of this case. She contended that those factors overwhelmingly showed that termination of R.A.'s parental rights was in the best interest of M.H.

The Guardian Ad Litem agreed with that conclusion and suggested that it was unrealistic for R.A. to claim that a family member might now come forward and file a petition to adopt the child, since he did not act to alert his family members when he learned that V.H. had abandoned her responsibilities to her children.

The trial court found that the vast majority of the factors set out in Tenn. Code Ann. § 36-1-113(i) showed that it was not in the best interest of M.H. for R.A. to retain his parental rights. The court stated, "I think this case is as clear as any I have heard with regard to parental right terminations that we should and do hereby terminate the parental rights of [R.A.]" The court's decision was memorialized in an order filed on November 30, 2004. The order stated that the ground for termination having been established, the court found that it was in the best interest of M.H. for the parental rights of R.A. to be terminated for the following reasons:

a. A meaningful relationship has not been established between [R.A.] and the child;
b. The child has established a close bond with the Petitioners, and
c. to subject the child to a relationship with [R.A.] is likely to have a detrimental and damaging effect on the child's emotional and psychological condition.

This appeal followed.

### III. DUE PROCESS ARGUMENTS

After the court's judgment became final, new counsel was appointed for the father's appeal. The father, through his new counsel, vigorously argues before this court that in light of the fundamental rights implicated in a termination proceeding, the petitioners and the court must follow exacting due process standards before depriving a citizen of such rights. He contends that these standards were violated when he was not served with notice of the dependency and neglect proceedings and when his trial counsel failed to be sufficiently assertive during the termination hearing. We will discuss these two issues in turn.

### A. THE DEPENDENCY AND NEGLECT PROCEEDINGS

The father complains that, contrary to statute, he was not given notice of the May 1, 2003, dependency and neglect petition. The statutes governing juvenile court proceedings require that

notice of the filing of a petition involving a child be given to "the parents, guardian or other custodian, a guardian ad litem and any other persons as appear to the court to be proper or necessary parties to the proceeding . . ." Tenn. Code Ann. § 37-1-121(a). *See also* Tenn. R. Juv. P. 5(d)(3). R.A. was not notified of the petition for dependency and neglect or of the petition for change of custody.

At the time the dependency and neglect petition was filed and the hearings were held, R.A. was not legally recognized as M.H.'s father. He was not married to V.H., he was not named on the birth certificate, and he had taken no steps to establish paternity of the child. He even had doubts as to whether he was M.H.'s biological father.[6] Under such circumstances, and the fact that he was incarcerated in California at the time and unable to provide care and custody, it is questionable whether he could be considered to have been a "necessary party" to the dependency and neglect proceedings.

As to the father's due process claims, due process requires only "such procedural protections as the particular situation demands." *Wilcox v. Wilson*, 984 S.W.2d 898, 902 (Tenn. 1998). In determining what protections are required in a particular situation, courts must consider three factors: (1) the private interest at stake; (2) the risk of erroneous deprivation due to the procedures used and the probable value, if any, of additional procedural safeguards; and (3) the government's interest. *Keisling v. Keisling*, 92 S.W.3d 374, 377 (Tenn. 2002). While a parent has a fundamental right to the care and custody of his or her child that may trigger due process protections regarding notice before custody is removed, *Id.* at 379, R.A. did not have custody of M.H. His right to custody had been forfeited, to the extent it ever existed, upon his incarceration and consequential inability to provide care. In other words, unlike the parent in *Kiesling*, the father herein did not face the loss of custody of his child due to the dependency and neglect proceeding. While R. A. asserts he had interests other than physical custody, as we discuss more fully below, he simply had no fundamental or significant interest at stake in the dependency and neglect proceeding.

The state's interest, through the court, in making sure this child was provided care and custody in a stable environment was great. His mother had abandoned him and was in jail at the time. "The primary purpose of a dependent-neglect proceeding is to provide for the care and protection of children whose parents are unable or unwilling to care for them." *In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004); *In the matter of M.E., M.E., R.B., M.B., S.B.*, No. M2003-00859-COA-R3-PT, 2004 WL 1838179, at *5 (Tenn. Ct. App. Aug. 16, 2004) (No Tenn. R. App. P. 11 application filed).

There was little or no risk that failure to provide notice to R.A. of the dependency and neglect petition would lead to a erroneous deprivation of custody. R.A. was in no position to provide either

---

[6]The appellees note that there is no order in the record declaring R.A. the biological father of M.H., and no evidence that any such order has ever been filed.

custody or evidence about M.H.'s current situation.[7] Considering the three relevant factors in the case before us, we must conclude that R.A. was not deprived of constitutional due process in the failure to give him notice of the dependency and neglect proceedings.

Assuming for the sake of argument that the father was entitled to notice, this court has held several times that a violation of due process in the dependency and neglect proceedings may be remedied by a subsequent termination of parental rights proceeding in which all due process requirements are met. *In re S.Y.*, 121 S.W.3d 358, 366 (Tenn. Ct. App. 2003). A trial court's decision to terminate parental rights "should not be reversed for any deprivation of due process that occurred at the initial dependency and neglect proceeding when [appellant] was afforded full procedural protection at the termination proceeding." *In re Hoover-Crawford*, No. M2000-10655-COA-R3-CV, 2001 WL 846044, at *4-5 (Tenn. Ct. App. July 27, 2001). *See also Department of Children's Services v. F.S.B.*, No. E2004-01220-COA-R3-PT, 2005 WL 195076, at * 5 (Tenn. Ct. App. Jan. 28, 2005) (holding that where father alleged his due process rights were violated when he was not made a party to foster care reviews, procedural errors at the dependency and neglect stage were cured by valid termination proceeding and the trial court did not rely on any evidence from the dependency and neglect proceedings in deciding to terminate the father's parental rights.)

This principle is particularly applicable where, as here, the parent claiming the deprivation of due process did not have custody, was not able to provide custody, and had little to add to the dependency and neglect determination. Thus, whether or not the failure to provide the father of notice of the dependency and neglect proceedings was error, it was remedied by the procedurally correct termination of parental rights proceedings. Even if that were not the law, the father has not shown a connection between the termination decision and the lack of notice to him of the dependency and neglect proceedings.[8]

The father argues that the failure to give him notice of the dependency and neglect petition and proceedings deprived him of the opportunity to participate in those proceedings, with several results. The first is that he was unable to advocate for and ensure compliance with requirements that he characterizes as his statutory rights. Most of those requirements, however, are procedures applicable to and obligations placed upon the Department of Children's Services and similar agencies when a child is removed from its home and placed in foster care. That was not the situation here.

---

[7]The father's testimony at the termination hearing shows that he had very little knowledge or understanding of the neglect V.H. had subjected her children to, although he insisted, incorrectly, that she was making progress in dealing with her drug addiction.

[8]The only argument propounded by R.A. that relates his lack of knowledge of the dependency and neglect proceedings to the termination holding is his assertion that he lost contact with his son after the mother abandoned him, weakening the parent-child bond. We discuss that argument in the context of the trial court's finding on best interests, below.

For example, the requirement of the development of a permanency plan, simply does not apply to individual custodians of dependent and neglected children.[9] The father has no right to insist that such procedures be followed or requirements applied in this situation. His notice of the dependency and neglect proceedings would not have altered that legal fact.

If, after a hearing, a juvenile court finds that a child is dependent and neglected, the court may transfer temporary legal custody to "[a]ny individual who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child." Tenn. Code Ann. § 37-1-130(a)(2)(A). The court appointed both a guardian ad litem and a court appointed special advocate to assure that the custodians were qualified and to otherwise look after the children's interests. The court clearly had authority to award custody to Ms. Mustin and then to the Bs.

The original petition to have the children found dependent and neglected was filed by Ms. Mustin and alleged that the mother was addicted to crack cocaine, had left the children on many occasions, and recently had left them with a man who called Ms. Mustin to come get them. The petition also alleged the mother was currently incarcerated in the Williamson County jail. A preliminary hearing on the petition was held shortly thereafter, and the mother appeared and apparently admitted her addiction to and use of crack cocaine that led to her abandonment of her children. The court gave temporary custody of the children to Ms. Mustin and appointed a guardian ad litem to "investigate the home of Diann Mustin and report any concerns to this Court."

The court set an adjudicatory hearing for July 28, 2003. Mother waived her right to have that hearing within 30 days so that she could receive inpatient substance abuse treatment before that hearing. The Bs filed their petition for change of custody and the court appointed a CASA worker to do a home study or otherwise investigate the Bs' home. The children were found dependent and neglected, and custody was given to the Bs.

Even at this stage, the father does not contest the finding that the children were dependent and neglected. "Dependent and neglected child" includes one who is suffering from neglect, Tenn. Code Ann. § 37-1-102(b)(12)(G), and M.H. clearly was. R.A.'s arguments indicate a misapprehension of the purpose of a dependency and neglect proceeding, which is to provide care and custody for children whose parents cannot or will not do so.

The court found that the children, including M.H., had been abandoned by their mother who was addicted to illegal drugs. The father does not assert that he could have presented any evidence that would have led to a contrary decision. Additionally, at the time of the initial hearing, the mother was incarcerated. It simply was neither possible nor advisable for the mother to assume

---

[9]Father also cited to Tenn. Code Ann. § 37-1-166 which he asserts requires an investigation and report to the court. That statute by its express terms applies to orders committing a child to the custody of DCS or continuing such custody. In any event, the trial court herein made arrangements for investigation of the Mustins' home and that of the Bs as well as of the children's situation.

responsibility for the care of her children. In fact, she asked for time to complete an inpatient substance abuse program. The children needed to be placed in a stable and nurturing environment, by court order, where they did not risk either abandonment or separation. R.A. was serving a fifteen year sentence in prison for drug trafficking, and he obviously could not provide a home for his child.

R.A. does not suggest that he could have offered any resources to alleviate the situation in which his child had been living. Although he now argues his relatives might have been interested in taking the child (even though at that time the father was unsure of his paternity), no one came forward even by the time of the termination hearing. The children knew Ms. Mustin and had spent time living with her in the past. They came to know the Bs before their custody was transferred to the Bs. They were closely bonded to each other. The advocates for the children recommended the placements ordered by the court. We cannot see how notice to the father of the dependency and neglect proceedings in these circumstances could have made any difference in either the finding of dependency and neglect or the disposition ordered by the court.

We are not persuaded that the failure to serve the father with notice of the dependency and neglect proceeding deprived him of due process rights. Neither are we persuaded that any lack of notice of that proceeding, even if required by statute, affects the validity of the termination proceeding, wherein R.A. was given notice, petitioned to have paternity established, was appointed counsel, and participated in the hearing.

## B. EFFECTIVE ASSISTANCE OF COUNSEL

R.A. also argues that the counsel appointed by the court for him did not effectively protect his interests. Ineffective assistance of counsel has evolved as a ground for reversal of judgment within the context of criminal proceedings and is based upon the Constitutional right of an accused party to counsel. U.S. Const. amend VI; Tenn. Const. art. I, § 9; *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975).

The United States Supreme Court has declined to recognize an absolute constitutional right to appointed counsel in parental termination cases. *Lassiter v. State,* 452 U.S. 18 (1981). However, Tennessee has now joined the vast majority of states which have declared that an indigent respondent in a parental termination case, like an indigent defendant in a criminal case, is entitled to the services of a court-appointed attorney. Tenn. R. Sup. Ct. 13, Section 1 (d)(2)(D). *See also*, *State Dept. of Human Services v. Taylor,* No. 03A01-9609-JV-00286 at *2, 1997 WL 122242 (Tenn. Ct. App. March 19, 1997) (No Tenn. R. App. P. 11 application filed).

The father reasons that the right to effective assistance of counsel is a logical extension of the general right to counsel and that it should apply in parental termination cases as well as in criminal cases, since fundamental constitutional rights are involved in both. While he cites no authority for this proposition, we note that the courts of several states have adopted that reasoning and have declared ineffective assistance of counsel to be a possible ground for reversal in termination cases. *See In re M.S.*,115 S.W.3d 534 (Tex. 2003); *In Re Wingo*, 758 N.E. 2d 780 (Ohio

9

App. 2001); *In Re Simon*, 431 N.W.2d 71 (Mich. App. 1988). *See also* Calkins, Susan, *Ineffective Assistance Claims in Parental Rights Cases,* 6 THE JOURNAL OF APPELLATE PRACTICE AND PROCESS, No. 2 (Fall 2004). We have not, however, found any Tennessee case that has taken this position.

We do not believe that the present case is an appropriate one for the establishment of a constitutionally protected right. However, in the interest of giving the father's argument full consideration, we will discuss the alleged deficiencies in the performance of his attorney. *Strickland v. Washington,* 466 U.S. 668 (1984), is a primary source of authority for the standards an appellate court must apply in the criminal context before reversing a lower court's judgment on the basis of ineffective assistance of counsel. *See Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004); *State v. Garrison,* 40 S.W.3d 426, 430 (Tenn. 2000). *Strickland* involved a sentencing hearing that resulted in imposition of the death penalty following a conviction for murder.

The United States Supreme Court declined to reverse Mr. Strickland's sentence, ruling that the Sixth Amendment right to counsel in criminal prosecutions is not violated unless the attorney's performance both "fell below an objective standard of reasonableness" and placed the reliability of the outcome in doubt. 466 U.S. at 687-88. Were a right to effective assistance to counsel found to exist in termination of parental rights proceedings, the appropriate standard would be no stricter than that established in *Strickland*.

The father argues that his attorney's performance was ineffective (1) because he did not raise the issue of lack of notice of the dependent and neglect proceedings, (2) he did not cross-examine the Bs, but merely asked R.A. if he had any questions to ask, and (3) he failed to raise evidentiary objections. We have already dealt with the notice issue and the arguments presented by the father on that issue, finding them to be without merit and most of them without supporting legal authority. Consequently, the failure to raise the lack of notice or any of the procedural arguments now made by R.A. cannot be considered as falling below the standard of reasonableness.

As to his other complaints, R.A. suggests several lines of cross-examination that his counsel might have followed, such as asking if the Bs had attended foster parent training and "whether they knew that the foster parents' first job is to try to promote family reunification." These suggested inquiries again have no relevance to individuals, rather than DCS, who are found qualified to provide custody and care to dependent and neglected children. They also overlook the fact that M.H. could not have been reunited with his biological father who was in a federal prison. M.H. was not removed from his parents' custody by DCS, and his father never exercised custody over him. There is no basis to conclude that the questions father contends his attorney should have asked were relevant to the issues before the court in the termination proceeding. Consequently, there is no showing that R.A.'s counsel's failure to ask them was unreasonable.

The father also notes several areas where his counsel could have made evidentiary objections but failed to do so. We have reviewed the transcript of the hearing as well as the particular examples given by the father as failures to object. We find that the testimony now objected to would probably

have been admitted, if trial counsel had interposed an objection, under the Tennessee Rules of Evidence and the Tennessee Rules of Juvenile Procedure. *See, e.g.*, Tenn. R. Evid. 803(25).

We conclude that the failure to make the objections identified by the father on appeal does not fall below an objective standard of reasonableness and did not place the reliability of the court's conclusions in doubt. These conclusions were based on the child's best interest. We therefore must conclude that even if we chose to establish a new precedent in Tennessee by recognizing ineffective assistance of counsel as a ground for reversal of a termination of parental rights, the father in this case would still not be entitled to such a reversal.

## IV. GROUND FOR TERMINATION

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, the courts must follow stringent procedures before reaching such a decision. To justify the termination of parental rights, the party seeking termination must prove by clear and convincing evidence both a statutory ground for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Tenn. Code Ann. § 36-1-113(g) sets out several different grounds that may be used to justify termination of parental rights. Only one of those grounds need be proven for a valid termination to be ordered, so long as it is proven by clear and convincing evidence, and it is also proven that termination is in the best interest of the child. *In re H.E.J.,* 124 S.W.3d 110, 113 (Tenn. Ct. App. 2003). The relevant ground in this case is found at Tenn. Code Ann. § 36-1-113(g)(6), which reads as follows:

> The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court.

The father has stipulated to that ground, the proof being uncontroverted that he is serving a fifteen year sentence for a criminal offense and that he began serving that sentence before the child reached the age of three.[10] His last personal contact with M.H. was before the child turned two years old. R.A. argues that because of sentence credits and/or parole, he will probably not have to serve his whole sentence and that he may win his freedom by 2008. However, Tenn. Code Ann. § 36-1-113(g)(6) speaks in terms of the sentence, and this court has declined to read into the statute any intent by the legislature to provide an exception for the mere possibility of an early release from prison. *In Re Adoption of Copeland*, 43 S.W.3d 483, 489 (Tenn. Ct. App. 2000). Thus, a ground for termination of the father's parental rights has been established by clear and convincing evidence.

---

[10]He was incarcerated before M.H. was born, but that incarceration appears to have pre-trial detention rather than as part of his sentence.

11

# V. THE BEST INTEREST OF THE CHILD

As we indicated above, in addition to the establishment by clear and convincing evidence of a statutory ground for termination of parental rights, the party seeking termination must also prove, by clear and convincing evidence, that the termination is in the best interest of the child. The requirement of grounds primarily involves the rights of the parent and the question of whether that parent has acted in such a way as to forfeit those rights.

In contrast, the question of best interest primarily involves the rights of the child. The question of the parent's rights is relevant during this phase of the court's inquiry only to the extent that it impacts the child's best interest. When the interests of the child and the parents diverge, the best interests of the child must prevail. *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *9 (Tenn. Ct. App. April 25, 2005)(No Tenn. R. App. P. 11 application filed); *In re M.E.W and J.W.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *9 (Tenn. Ct. App. April 21, 2004).

> The best interests of the child do not become the paramount consideration until the trial court has determined that the parent is unfit based on clear and convincing evidence of one or more of the grounds for termination listed in Tenn. Code Ann. § 36-1-113(g). Once a parent has been found to be unfit, the interests of the parent and child diverge. While the parent's interests do not evaporate upon a finding of unfitness, the focus of the proceedings shifts to the best interests of the child.

*In Re Audrey S. & Victoria L.*, No. M2004-02758-COA-R3-PT, 2005 WL 2051286 at *26 (Tenn. Ct. App. Aug. 25, 2005).

The legislature has clearly stated the rule in this regard:

> In all cases, when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child, which interests are hereby recognized as constitutionally protected and, to that end, this part shall be liberally construed.

Tenn. Code Ann. § 36-1-101(d).

The trial court herein was clearly aware of this principle, stating:

> Now, as far as [the father] goes, he is in a difficult situation and it might very well be in his best interest and maybe even the best interest of some other members of his family, if they were able to maintain a relationship with his child. We are not here about that, we are here about the child's best interest.

> Consequently, although the father would like to be part of his son's life, would like to be able

12

to call him "son" as he states in his brief, and would like his child to know his family, the father's wishes are not a basis for determining the best interests of M.H.

The legislature has given the courts guidance as to the factors it should consider when determining a child's best interest. Tenn. Code Ann. § 36-1-113(i) reads:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

13

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In its ruling from the bench, the trial court declared that the vast majority of the statutory factors indicated that it would not be in the best interest of M.H. to allow R.A. to retain his parental rights.[11]  The court also found that M.H. was closely bonded to his two siblings "who are his sole grounding in this world."

The trial court's written final judgment only mentions three factors affecting the best interest of M.H.: that a meaningful relationship had not been established between father and child, that the child had established a close bond with the Bs, and that to subject the child to a relationship with the father was likely to have a detrimental effect on his emotional and psychological condition, which we interpret as relating to the close bond between M.H. and his siblings and the sense of security provided by that bond   The father does not dispute the finding of a close emotional bond with the Bs.

The father argues that there was insufficient evidence presented for the trial court to conclude that subjecting M.H. to a relationship with his father would be emotionally and psychologically detrimental to the child.  We think the relevant evidence, however, is that regarding the relationship between M.H. and his siblings as well as their integration into the Bs' home.  Prior to the Bs obtaining custody, M.H. and his siblings were subjected to constant uncertainty and instability, frequent changes of residence, intermittent disappearances by the mother, and exposure to drug use. Through all this uncertainty, the three children were never separated from each other.  As a result, they bonded strongly to one another, finding each other's presence to be the one comforting constant in an otherwise unstable world.[12]  After the Bs took on the role of parents, the children were able,

---

[11]We note that many of the factors, such as the failure to pay child support, lack of regular visitation, and failure to make an adjustment of circumstances, are inherent to the constraints imposed by incarceration.  While that does not mean that they are irrelevant to the question of best interests, the establishment of the ground of incarceration for ten years necessarily implies the parent will be unable to provide parental support and care that would otherwise be available. But the best interest analysis is a separate requirement from the establishment of grounds, and the factual situations involving incarcerated parents will vary from case to case.  We cannot assume that lengthy incarceration, in and of itself, will necessarily lead to the conclusion that termination of the incarcerated parent's rights is in the child's best interest.  Conversely, lengthy incarceration insures that the child cannot be returned to the custody of the parent in the near future and, without termination of that parent's rights, would be denied the opportunity of adoption and face uncertainty of placement, lack of stability, and lack of security.  As with any other termination of parental rights case, individualized decision making based on the facts of the particular case is required.

[12]We note than when asked about the possibility of separating M.H. from his siblings, the father argued that this should not be a problem, because they had an older half-brother (another child of V.H.) who lived with his father, and there was no evidence that separation from this older sibling had caused M.H. any harm. But the proof showed that the older child had never been a part of the tight bond that the three siblings formed with each other. Interestingly, R.A. couldn't even remember the name of the older child, but the Bs knew him, and sometimes had him come over to visit with their family.

14

for the first time, to experience the security and peace of mind that comes from being part of a stable and loving family. The trial court was properly concerned about this relationship.

The father concedes that he did not have a meaningful relationship with his son at the time of trial, but he claims that he did have such a relationship in the past, which the Bs undermined by failing to promote contact between himself and M.H. The father has overstated the significance of his prior relationship to M.H. He has been incarcerated in a distant location for the entire lifetime of the child. His own testimony showed that before he was sent to the federal prison in California, R.A. only saw his son twice, both times before the child reached the age of two and both times under the restrictions applicable to jail visitation.

The father argues that the phone calls he made and the presents he had others send on his behalf prior to the Bs obtaining custody of M.H. constituted evidence of a meaningful relationship. We find that a doubtful proposition at best. A meaningful relationship must be meaningful to both parties, especially where the child's interest is paramount. The father's rare and brief contacts with his son may have had some meaning to him, but from the point of view of a child so young, such tenuous contact is unlikely to carry very much meaning. The evidence in this case is that M.H. considered Mr. B his father and never mentioned R.A. There is simply no evidence that the child missed the calls from R.A. or had any significant connection to him.

The father contends that the acts of "the Ministry," Ms. Mustin, or of the Bs deprived him of meaningful contact with his son, because he did not know where either the child or the mother was. However, it was actually the mother's abandonment of the children and her incarceration that led to the children's placement in the custody of first Ms. Mustin and then the Bs. R.A. had apparently taken no action to have his relatives, DCS, or anyone else investigate to insure his child was being cared for by the drug-addicted mother. Additionally, if we totally disregard the time during which R.A. claims he was unable to contact M.H., the evidence shows that M.H. did not have a meaningful relationship with R.A. prior to that time.

This father has never had custody of or provided a home for this child. He maintained doubts about whether he was the biological father, even stating early on in this action that it had never been proved he was the father. He has only seen this child twice, when the child was very young.

More importantly, however, the fact is that R.A. will not be able to provide a home for M.H. anytime in the near future. There is little likelihood or even hope that M.H. and R.A. can be "reunited," a term we use advisedly since they were never "united," in any time frame that could be considered the near future in the life of this eight year old boy.

That situation is exactly what the statutes on adoption and termination of parental rights were designed to eliminate. The public policy of this state, as expressed by the General Assembly, is to provide children who have been removed from the custody of their parents "a reasonable assurance that, if an early return to the care of their parents is not possible, they will be placed in a permanent

home at an early date." Tenn. Code Ann. § 37-2-401(a).[13]  The stated purposes of our statutes on adoption include the protection of the interest of the children involved and assurance that proceedings are held expeditiously "to enable the child to achieve permanency, consistent with the child's best interests, at the earliest possible date."  Tenn. Code Ann. § 36-1-101(a)(5).  The legislature has established as public policy that termination of parental rights, as a prerequisite to adoption, is in the best interest of a child who cannot be returned to the custody and care of the parent.  *In re M.E.W and J.W.W.*, 2004 WL 865840, at *10.

The non-exclusive list of factors to be considered in determining best interests, set out above, reaffirms the significance of the fact that it is unlikely that a child can be returned to a parent's custody in the near future.  Factors (1), (2), (5), (6), (7) and (8) all deal with the likelihood of the child returning to the parent's custody and home.  Where such reunification has been shown to be unlikely, that circumstance must be given significant weight in the determination of the child's best interest.

This court has frequently and for a long time recognized that, as a general proposition, a child's best interest was served by termination of parental rights where, no matter the cause, there was no reasonable expectation the child could be reunited with a parent in the near future.  *See, e.g., In the Matter or S.R.C.*, 156 S.W.3d 26, 30-31 (Tenn. Ct. App. 2004); *In the Matter of L.J.C., A.L.C. and J.R.C.*, 124 S.W.3d 609, 618 & 624 (Tenn. Ct. App. 2003); *In the Matter of A.W. & J.W.*, 114 S.W.3d 541, 548 (Tenn. Ct. App. 2003). *See also In re M.E.W and J.W.W.*, 2004 WL 865840, at *11 (discussing cases so holding).  Termination of parental rights is a prerequisite to adoption which brings with it the security and stability that is of primary importance to children.  While there are some cases where the particular circumstances dictate an exception to the general proposition, this case is not one of them.

Accordingly, we affirm the trial court's holding that termination of the father's parental rights is clearly and convincingly in M.H.'s best interest.

## VI.

The judgment of the trial court is affirmed. We remand this case to the Juvenile Court of Williamson County for any further necessary proceedings.  The costs on appeal are taxed to the appellant, R.A.

_____
PATRICIA J. COTTRELL, J.

---

[13]While that statutory statement of purpose applies specifically to the statutes on foster care, the policy expressed is applicable to any situation where a child cannot be returned to his or her parent.